Exhibit 1



**_KUDERER & TAMBLYN_**

Date: January 6. 2021

Dear Mr. Shanbhag and Mr. Fessenden,

We represent Nannette Basa; a former employee of your firm.  Pursuant to the WAC cited below, please provide us **within 10 days** a written statement of the reason for termination and a copy of the entire personnel file. You may contact our office if you wish to transmit the file electronically.

Since this matter will likely involve litigation, you are specifically advised to keep all records, documents, emails, and other material that, in any way, relate to your former employee and any persons connected to the termination. Secretion or destruction of such documents is spoliation, violates legal rules and may have serious consequences.

Please contact the undersigned if you have any questions.

WAC 296-126-050, Employment records.
    (1) Every employer shall keep for at least three years a record of the name, address, and occupation of each employee, dates of employment, rate or rates of pay, amount paid each pay period to each such employee and the hours worked.
    (2) Every employer shall make the record described in subsection (1) available to the employee, upon request, at any reasonable time.
    (**3) Every employer shall, within ten business days of receiving a written request by a former employee, furnish a signed written statement stating the reasons for and effective date of discharge.**

Sincerely,

George O. Tamblyn     gtamblyn@mercerlg.com

---

**_KUDERER & TAMBLYN_** | 7900 SE 28th St, Suite 320 | Mercer Island, Washington 98040

Office: 206.236.2769 | Fax: 206.236.1893 | www.mercerlg.com

Exhibit 2



## Law Offices of Alex J. Higgins, LLC

2200 Sixth Avenue, Suite 500 Seattle, WA 98121
206.340.4856
alex@alexjhiggins.com

FOR SETTLEMENT PURPOSES ONLY

April 15, 2021

VIA EMAIL

Theresa McDaniel
Assistant General Counsel
Employment Law
BrandSafway
TMcDaniel@BrandSafway.com

     Re:    *Nannette Basa*

Dear Ms. McDaniel:

My firm represents Nannette Basa whose employment was abruptly ended after years of excellent performance as a recruiter. (I have been hired to litigate this case because Mr. Tamblyn – her previous lawyer – has health issues and is preparing to retire.)

The evidence strongly suggests that a large factor in her termination was her age. BrandSafway selected Ms. Basa for layoff, but retained two much younger recruiters. Also, after terminating Ms. Basa, BrandSafway actually <u>added</u> another recruiter. Although we do not know his precise age, his photograph on LinkedIn shows a young man, probably in his early 30s. Ms. Basa is 49 years old.

We also plan to bring a claim for race discrimination. Ms. Basa was the only person of color serving as a recruiter for BrandSafway. The two retained recruiters are white and the new hire is also white. We believe that a jury will conclude that Ms. Basa's age or race (or a combination thereof) was a "substantial factor" in the decision to select her for a layoff. This case poses a substantial risk to BrandSafway.

## I.      FACTUAL BACKGROUND

Ms. Basa served as a corporate recruiter for many years in several different capacities for Brand Safway and its predecessor. She was a contractor before 2018 when she earned a position as a full-time employee. She also worked remotely from her home in the Seattle area.

Ms. Basa reported to two different managers: Rob Broschinsky until October 2019, and then Karen Riapos until her termination. Ms. Riapos Director of Talent Acquisition. Neither manager indicated anything negative about her performance.

Theresa McDaniel
April 15, 2021
Page 2

Meanwhile, two other recruiters were hired in February 2020: Ryan Wilson and Nicole Norris. Both are 35 years old. Both are white. For some reason, both were paid more than Ms. Basa. That eliminates any cost-saving justification for terminating her.

Further, we do not understand any possible justification for retaining Ryan Wilson instead of Ms. Basa. He was a new employee who took a leave of absence after less than two months on the job.

Next, after discharging Ms. Basa, BrandSafway actually hired another younger white male to work as a recruiter. I have attached the LinkedIn profile for this new hire (Wes P.) for your review. It appears he has less experience than Ms. Basa. Even if his experience is equivalent, it is extremely suspicious to replace a good-performing woman of color with a younger white man.

Despite diligent efforts, Ms. Basa has not been able to find another job. She may be unemployed for about a year (it has been five months already). It also appears that she may be forced to take a pay cut. Therefore, her lost wages are going to be very substantial.

## II.      LEGAL ANALYSIS

### A.  Ms. Basa's Age and Race Combined as a "Substantial Factor" in Her Discharge.

The Washington Law Against Discrimination ("WLAD") effectuates a public policy of the highest order. *See, e.g.*, *Martini v. The Boeing Co.*, 137 Wn.2d 357 (1999). As such, it is strictly enforced and given broad interpretation by Washington courts – broader than its federal counterparts. There is liability for discrimination if the employee's protected characteristic was a "substantial factor" in the employment decision; it does not need to be the determining factor. *Mackay v. Acorn Custom Cabinetry*, 127 Wn.2d 302 (1995).

There can be more than one "substantial factor." See *Washington Pattern Jury Instruction*, 330.01.01 ("'Substantial factor' does not mean the only factor or the main factor in the challenged act or decision.") Justice Neil Gorsuch recognized this well-established principle of discrimination law in a recent U.S. Supreme Court decision which explained that "a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision." *Bostock v. Clayton County, Georgia*, No. 17-1618 (U.S. June 15, 2020) (*slip op. at* *6 (emphasis in original)). The opinion also notes that a plaintiff need not show that an illegal motive was "the sole or primary cause of the employer's adverse action." *Id.* at *14. Accordingly, it "doesn't matter if other factors besides the [illegal one] contributed to the decision." *Id.* at *9. The Court was emphatic that an employer cannot avoid liability by showing a legitimate factor was <u>one</u> cause of the employment decision: "that suggestion is at odds with everything we know about the statute." *Id.* at *22 (emphasis added).

Washington courts vigorously protect the rights of an employee to have a jury decide discrimination cases. Proof of discrimination through circumstantial evidence is the norm: "in discrimination cases it will seldom be otherwise." *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 189 Wn.2d 516, 526 (2017). It is improper to deny an employee the right to a jury trial

Theresa McDaniel
April 15, 2021
Page 3

where the employee has only presented circumstantial evidence of discrimination.  *Scrivener v. Clark Coll.*, 181 Wash. 2d 439 (2014).

Judges and juries know that sophisticated corporations do not openly admit discriminatory intent or put such motives in a memo. *See, e.g., McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1112 (9th Cir. 2004); *accord, Rich v. Bellevue School Dist.*, 122 Wn. App. 1024 (2004) (circumstantial evidence is perfectly adequate because an employer discriminating based on age is not likely to announce it in a memo).

The Washington Supreme Court has "repeatedly emphasized that plaintiffs may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action. Indeed, in discrimination cases it will seldom be otherwise." *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas Cty.*, 189 Wn.2d 516, 526 (2017).

Undoubtedly, there are issues of fact on whether Ms. Basa's age or race was a factor in the decision in light of the clear preference for younger and whiter employees on the recruiting team.

B.  Mr. Basa's Damages are Extensive and Ongoing.

Ms. Basa's damages are already substantial.  We anticipate that she will earn less over the remainder of her working life as she will start over at new employer.  Additionally, at trial she will be entitled to recover compensation for emotional harm.  Washington juries are extremely generous to plaintiffs in discrimination cases.  Washington juries have awarded large sums to compensate for emotional distress in discrimination and retaliation cases.  For instance, in July 2016, a jury found that the Seattle Police Department had retaliated against two officers. Despite the fact that neither officer lost their jobs, the jury awarded substantial damages for emotional distress:  $1.5 million to one and $750,000 to the other.  Those amounts were upheld by the Court of Appeals.  *Elias v. City of Seattle*, 2018 WL 993644, at *11 (Wash. Ct. App. Feb. 20, 2018).

That case is not an outlier.  In October 2018, in a failure to accommodate and disability discrimination case, a Washington federal jury awarded a former employee $236,812 in economic damages and $4.7 million in compensatory damages.[1]

---

[1] Verdict Form, *Coachman v. Seattle Auto Mgmt.*, No. 17-187 (W.D. Wash. Oct. 11, 2018) ECF No. 75.

Theresa McDaniel
April 15, 2021
Page 4

Very truly yours,

LAW OFFICES OF ALEX J. HIGGINS

*Alex J. Higgins*

Alex J. Higgins

Exhibit 3

HONORABLE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NANNETTE BASA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRAND SHARED SERVICES, LLC, a<br>Delaware corporation,<br><br>Defendant. | Case No. 2:21-cv-00754 MLP<br><br>DEFENDANT'S OBJECTIONS AND<br>RESPONSES TO PLAINTIFF'S FIRST<br>INTERROGATORIES AND REQUESTS<br>FOR PRODUCTION |

Defendant Brand Shared Services, LLC ("Defendant") responds to Plaintiff Nannette
Basa's ("Plaintiff") First Interrogatories and Requests for Production as follows:

**PRELIMINARY STATEMENT**

The information contained in each response is based only on the information currently
available to Defendant. These responses are made solely for purposes of this action. Each
response is subject to all objections as to competence, relevance, materiality, propriety, and
admissibility, and all other objections and grounds which would require the exclusion of any
statements contained herein, if such statements were made by a witness present and testifying at
court. All objections and grounds are expressly reserved and may be interposed at the time of
trial.

DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST
INTERROGATORIES AND REQUESTS FOR PRODUCTION  - 1
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

**INTERROGATORIES**

**INTERROGATORY NO. 1:**        Please identify all individuals who were involved in the decision to end Plaintiff's employment and describe in detail each individual's participation in the decision.

**ANSWER:**  Defendant objects to this interrogatory as vague and ambiguous with regard to the meaning of the phrases "involved in" and "participation in the decision."  Subject to and without waiving the foregoing objection, and assuming this interrogatory seeks the person or people who identified Plaintiff as a person to be laid off pursuant to the 2020 reduction-in-force, Defendant answers as follows:  Vice President of Human Resources Michelle Roman and Director of Talent Acquisition Karen Riapos.

**INTERROGATORY NO. 2:**        Please identify all employees laid off (or whose jobs were eliminated) as a part of the same reduction(s) in force that lead to Plaintiff's termination. For each individual identified, include their job title, name, age, and race/nationality.

**ANSWER:**  Defendant objects to this interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Defendant laid off approximately 100 people as part of the reduction in force that lead to Plaintiff's termination.  It would be very onerous and time-intensive for Defendant to identify every single one of those people and provide all of the detailed demographic and contact information requested by Plaintiff.  Further, this interrogatory is not reasonably calculated to lead to the discovery of admissible evidence, because the hundred employees who were laid off spanned the company and the decisions to terminate their employment were made by different decision-makers in their respective departments.  Most of those decision-makers have likely never worked with or interacted with Plaintiff and were not involved in the decision to terminate her employment.

Defendant further objects that this interrogatory seeks to invade third party privacy rights and seeks confidential employee personnel information.  Defendant also objects to this

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
AND REQUESTS FOR PRODUCTION  - 4
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

| Michelle Roman | VP of HR | 50+ | Unknown | c/o Defendant's counsel |

**INTERROGATORY NO. 4:**        Please identify and describe in detail your process for determining which employees were retained and which were laid off during reductions in force for the last two years throughout the company.  If there are specific written policies, procedures, or other guidelines that are used to direct the process, please identify those documents.

**ANSWER:**  Defendant objects to this interrogatory to the extent it seeks attorney client privileged communication and attorney work product.  Defendant further objects to this interrogatory as vague and ambiguous, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.  Defendant employs approximately 38,000 people across 30 countries; when reductions-in-force happen, they can impact hundreds or thousands of employees and there may be considerable variation regarding the factors that factor into decisions at a departmental level.  For example, in the 2020 reduction in force alone, Defendant estimates that approximately 100 people were laid off.  Decisions to terminate are made by different decision-makers in different departments.

Subject to and without waiving the foregoing objections, Defendant answers as follows: to the extent there are any responsive written policies, procedures, or guidelines, they will be produced.

**SUPPLEMENTAL ANSWER:**  Subject to and without waiving the foregoing objections, Defendant supplements as follows -- The process for determining which employees in the HR department (i.e., Plaintiff's former department) were laid off was as follows: with an eye toward meeting specific value capture targets set forth by corporate, leadership assessed the HR structure (current and future) by reviewing the number active employees and their high-level roles and responsibilities and then looking for opportunities to combine roles and responsibilities

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
AND REQUESTS FOR PRODUCTION  - 7
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

1  for each of the  HR work groups.  Once leadership understood where they had opportunity to

2  streamline work within each work group, they took a closer look at the roles and responsibilities

3  for each incumbent in those roles and made a determination of which roles to eliminate.

4  **INTERROGATORY NO. 5:**        Please identify all individuals who were involved in

5  the decision to the hire or create positions for Ryan Wilson, Nicole Norris and "Wes P.", and

6  describe each person's participation in detail.

7  **ANSWER:**  Defendant objects to this interrogatory as vague and ambiguous and to the

8  extent it assumes that positions were "created" for Ryan Wilson, Nicole, Norris, and "Wes P."

9  (believed to be Wes Powell who is a contractor and not Defendant's employee).

10  Subject to and without waiving the foregoing objections, and assuming the interrogatory

11  seeks the names of the person who hired Ryan Wilson, Nicole Norris, and "Wes P." (believed to

12  be Wes Powell), Defendant answers as follows:

13  The decisions to hire Mr. Wilson and Ms. Norris were made by Director of Talent

14  Acquisition Karen Riapos.  Defendant did not hire "Wes P." (believed to be Wes Powell) as an

15  employee; he was a contractor.

16  **INTERROGATORY NO. 6:**        Please identify all individuals who were considered

17  for the positions that were ultimately filled by Ryan Wilson, Nicole Norris and "Wes P.".  For

18  each individual identified, include their job title, name, age, and race/nationality.

19  **ANSWER:**  Defendant objects to this interrogatory as vague and ambiguous with regard

20  to the meaning of the phrase "were considered for the positions."  Defendant also objects to this

21  interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the

22  discovery of admissible evidence.  In the ordinary course of business, Defendant does not store

23  or maintain information related to applicants for a particular position.  It would be

24  extraordinarily difficult for Defendant to try to scour through its records to try to reconstruct the

25  hiring process for the roles that Mr. Wilson and Ms. Norris were ultimately hired into.

26

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
AND REQUESTS FOR PRODUCTION  - 8
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

1  **REQUEST FOR PRODUCTION NO. 2:**  Please produce copies of all documents

2  identified in Defendant's initial disclosures.

3  **RESPONSE:**  Defendant objects to this request as vague and ambiguous and overly

4  broad.  Subject to and without waiving these objections, Defendant will produce responsive

5  documents.

6  **REQUEST FOR PRODUCTION NO. 3:**  For the period of September 1, 2020,

7  through present, please produce all electronic correspondence (including but not limited to email,

8  text messages, or any other method of written communication) to or from (1) Karen Riapos, or

9  (2) any other individual identified in Your answer to Interrogatory No. 1, that contain the

10  following search terms: "Nannette", "Basa".  For this Request, emails or other communications

11  in which Plaintiff was a direct recipient or the sender do not need to be produced.  If any

12  documents are redacted or withheld for privilege, please identify the documents or redactions in

13  a privilege log.

14  **RESPONSE:**  Defendant objects to this request to the extent it seeks attorney client

15  privileged communications and attorney work product.  Defendant further objects to this request

16  because it is overbroad, unduly burdensome, and not reasonably calculated to lead to the

17  discovery of admissible evidence and could potentially include confidential, sensitive trade

18  secrets of Defendant.  Karen Riapos was Plaintiff's supervisor during the period captured by this

19  request and is expected to have a high volume of emails that contain the terms "Nannette" and

20  "Basa" in the 16-month period that is the subject of this request.

21  Subject to and without waiving the foregoing objections, and upon execution of a

22  Protective Order, Defendant will produce non-privileged responsive documents (i.e., emails to or

23  from Karen Riapos and/or Michelle Roman from September 2020 to present containing the terms

24  "Nannette" or "Basa").

25

26  DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
AND REQUESTS FOR PRODUCTION  - 10
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

1    ==REQUEST FOR PRODUCTION NO. 4:==   Please produce all documents identified in

2    Your answer to Interrogatory No. 4.

3    ==RESPONSE:==  Defendant hereby incorporates by reference its objections to Interrogatory

4    No. 4.  Subject to and without waiving the foregoing objections, Defendant will produce any

5    non-privileged responsive documents.

6    **REQUEST FOR PRODUCTION NO. 5:**   With regards to the positions filled by Ryan

7    Wilson and Nicole Norris and "Wes P."[1], please produce the related job postings, the

8    applications materials submitted by all applicants, interview notes, and any communications or

9    documents regarding the decision making process.

10    **RESPONSE:**  Defendant hereby incorporates by reference its objections to Interrogatory

11    Nos 5 and 6.  Subject to and without waiving the foregoing objections, and upon execution of a

12    Protective Order, Defendant will produce responsive any nonprivileged responsive documents.

13    **REQUEST FOR PRODUCTION NO. 6:**  Please produce the OWBPA disclosures

14    provided to each person that was selected for layoff during the reduction in force that lead to

15    Plaintiff's termination.

16    **RESPONSE:**  Defendant objects to this request as vague, ambiguous, overbroad, unduly

17    burdensome, and not reasonably calculated to lead to the discovery of admissible evidence.

18    Subject to and without waiving these objections, Defendant will produce non-privileged

19    responsive documents for the individuals identified in interrogatory 2.

20

21

22

23

24

25    ---
      [1] *See* https://www.linkedin.com/in/wes-p-924947162/?locale=es_ES

26    DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
      AND REQUESTS FOR PRODUCTION  - 11
      (CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

78770822v.1

1    DATED: January 14, 2022.                    SEYFARTH SHAW LLP

2

3                                                By: */s/Emma Kazaryan*
                                                 Helen M. McFarland, WSBA No. 51012
4                                                Emma Kazaryan, WSBA No. 49885
                                                 999 3rd Avenue, Ste. 4700
5                                                Seattle, WA 98104
                                                 P: (206) 946-9423
6                                                F: (206) 299-9974
                                                 hmcfarland@seyfarth.com
7                                                ekazaryan@seyfarth.com

8                                                *Attorneys for Defendant Brand Shared
                                                 Services, LLC*
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
     DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES
     AND REQUESTS FOR PRODUCTION  - 12                                    SEYFARTH SHAW LLP
     (CAUSE NO. 2:21-CV-00754 MLP)                                            Attorneys at Law
                                                                            999 Third Avenue
                                                                               Suite 4700
                                                                         Seattle, WA  98104-4041
                                                                            (206) 946-4910
     78770822v.1

Exhibit 4

1          HONORABLE MICHELLE L. PETERSON

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF WASHINGTON
8

NANNETTE BASA, an individual,              Case No. 2:21-cv-00754 MLP
9
                 Plaintiff,                DEFENDANT'S OBJECTIONS AND
10                                         RESPONSES TO PLAINTIFF'S SECOND
                                           INTERROGATORIES AND REQUESTS
11        v.                               FOR PRODUCTION

12  BRAND SHARED SERVICES, LLC, a
    Delaware corporation,
13
                 Defendant.
14

15        Defendant Brand Shared Services, LLC ("Defendant") responds to Plaintiff Nannette

16  Basa's ("Plaintiff") Second Interrogatories and Requests for Production as follows:

17                        **PRELIMINARY STATEMENT**

18        The information contained in each response is based only on the information currently

19  available to Defendant. These responses are made solely for purposes of this action. Each

20  response is subject to all objections as to competence, relevance, materiality, propriety, and

21  admissibility, and all other objections and grounds which would require the exclusion of any

22  statements contained herein, if such statements were made by a witness present and testifying at

23  court. All objections and grounds are expressly reserved and may be interposed at the time of

24  trial.

25

26
    DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S SECOND
    INTERROGATORIES AND REQUESTS FOR PRODUCTION  - 1
    (CAUSE NO. 2:21-CV-00754 MLP)
                                                        SEYFARTH SHAW LLP
                                                          Attorneys at Law
                                                         999 Third Avenue
                                                            Suite 4700
                                                     Seattle, WA  98104-4041
                                                        (206) 946-4910
    83055578v.1

## INTERROGATORIES

**INTERROGATORY NO. 7:**  Please identify and describe all policies regarding the retention of documents that were in effect at Brand anytime between January 1, 2019, and present. For each policy identified, please explain how it applied to the preservation of email, text messages, or other electronic communications and how that was applied to preservation of such electronically-stored information related to Nannette Basa or her claims.

**ANSWER:**  Defendant objects to this interrogatory as not reasonably calculated to lead to the discovery of admissible evidence.  Defendant's document retention policies have absolutely no conceivable bearing on the claims or defenses in this matter.  In response to Plaintiff's discovery requests, Defendant has already produced almost two thousand pages of documents and expects to produce thousands more.  The documents span a broad temporal range and Defendant has not represented that Defendant is unable to produce responsive documents due to unavailability.  Subject to and without waiving the foregoing objection, Defendant is willing to meet-and-confer with Plaintiff and consider producing any such policies if Plaintiff articulates a specific reason why these policies are reasonably calculated to lead to the discovery of admissible evidence.

## REQUESTS FOR PRODUCTION

*All responsive documents may be produced either on paper or searchable .PDF.* Plaintiff reserves the right to request documents in native electronic format as may be requested in a later date. All spreadsheets and WORD documents should be produced electronically in their native format.

**REQUEST FOR PRODUCTION NO. 7:**  For the period of January 1, 2019, through present, please produce all electronic correspondence (including but not limited to email, text messages, or any other method of written communication) to or from (1) Karen Riapos, (2) Meg Newman, (3) Rodney Broschinsky, (4) Ryan Wilson, (5) Nicole Norris, and (6) Nannette Basa

DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND
INTERROGATORIES AND REQUESTS FOR PRODUCTION  - 4
(CAUSE NO. 2:21-CV-00754 MLP)

83055578v.1

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

that relate to Plaintiff and/or Plaintiff's job duties. If any documents are redacted or withheld for privilege, please identify the documents or redactions in a privilege log.

**RESPONSE:** Defendant objects to this interrogatory as overbroad, unduly burdensome, harassing, and not reasonably calculated to lead to the discovery of admissible evidence. Following a discovery conference, Plaintiff agreed to limit the foregoing request for production to the following requests:

> For Nannette Basa, we want her entire inbox and sent folder for the requested period. We realize there will be a lot of chaff in what we get but we are prepared to spend the time going through everything.
>
> For Mr. Broschinsky, we are only requesting the following two search terms: "Nannette" and "Basa".
>
> For Ms. Riapos, Mr. Wilson, and Ms. Norris, we propose the following search terms: "Nannette", "Basa", "VNDLY", "layoff", "retain", and "RIF". In addition, for Mr. Wilson and Ms. Norris, we are narrowing the time frame to August 1, 2020, to June 30, 2021.

Defendant has already reviewed and produced thousands of pages of documents in response to this request. Defendant is working on deploying some strategies and tools (some of which come at significant expense to Defendant) to help make the review process as efficient as possible. However, there is still a high volume of documents to review and many appear to have zero probative value. Defendant objects to this request and if review proves to be prohibitively onerous or expensive, or if in the course of review, strategies for expediting review and making it more likely to yield relevant documents emerge, Defendant may need Plaintiff to narrow this request further.

Subject to and without waiting the foregoing objections, Defendant is producing non-privileged responsive documents subject to the parties' Stipulated Protective Order.

DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND
INTERROGATORIES AND REQUESTS FOR PRODUCTION - 5
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

83055578v.1

1  Defendant is continuing to review documents for production and will produce responsive

2  documents on a rolling basis.

3

4      **REQUEST FOR PRODUCTION NO. 8:**  Please produce all policies identified in the

5  answer to Interrogatory No. 7.

6      **RESPONSE:**  Defendant objects to this request for production as not reasonably

7  calculated to lead to the discovery of admissible evidence.  Defendant's document retention

8  policies have absolutely no conceivable bearing on the claims or defenses in this matter.  In

9  response to Plaintiff's discovery requests, Defendant has already produced almost two thousand

10  pages of  documents and expects to produce thousands more.  The documents span a broad

11  temporal range and Defendant has not represented that Defendant is unable to produce

12  responsive documents due to unavailability.  Subject to and without waiting the foregoing

13  objection, Defendant is willing to meet-and-confer with Plaintiff and consider producing any

14  such policies if Plaintiff articulates a specific reason why these policies are reasonably calculated

15  to lead to the discovery of admissible evidence.

16  DATED: May 6, 2022.                    SEYFARTH SHAW LLP

17

18                                By: */s/ Helen McFarland*

19                                Helen M. McFarland, WSBA No. 51012
                                  Emma Kazaryan, WSBA No. 49885
20                                999 3rd Avenue, Ste. 4700
                                  Seattle, WA 98104
21                                P: (206) 946-9423
                                  F: (206) 299-9974
22                                hmcfarland@seyfarth.com
                                  ekazaryan@seyfarth.com
23

24                                *Attorneys for Defendant Brand Shared*
                                  *Services, LLC*
25

26
DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND
INTERROGATORIES AND REQUESTS FOR PRODUCTION  - 6
(CAUSE NO. 2:21-CV-00754 MLP)

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

83055578v.1

1

**VERIFICATION**

2

3          I, _____, have read the foregoing Interrogatories and Responses to Requests thereto,

4   and am familiar with the concerns thereof.  To the best of my knowledge, the foregoing answers

5   are true and contain such information as was available to me at the time these answers were

6   prepared.  I declare under the penalty of perjury of the laws of the State of Washington that such

7   answers are true.

8

9                                                          _____
                                                           Person's Name Here

10

11                                **ATTORNEY VERIFICATION**

12

13          I, the attorney of record for the Defendant, here certify that the objections and responses

14   are made in compliance with FRCP 26(g).

15

16          DATED this 6th day of May, 2022.

17                                                  _s/Emma Kazaryan for_____
                                                    Helen M. McFarland, WSBA No. 51012

18

19

20

21

22

23

24

25

26
     DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND
     INTERROGATORIES AND REQUESTS FOR PRODUCTION  - 7
     (CAUSE NO. 2:21-CV-00754 MLP)
                                                        SEYFARTH SHAW LLP
                                                          Attorneys at Law
                                                         999 Third Avenue
                                                            Suite 4700
                                                       Seattle, WA  98104-4041
                                                         (206) 946-4910
     83055578v.1

Exhibit 5

KAREN RIAPOS - 06/03/2022

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3                         AT SEATTLE

4    _____

5    NANNETTE BASSA,                    )
                                        )
6            Plaintiff,                 )
                                        )
7    vs.                                )No.2:21-CV-007540-MLP
                                        )
8    BRAND SHARED SERVICES, LLC,        )
                                        )
9            Defendant.                 )
                                        )
10   _____

11     REMOTE VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

12                            OF

13                       KAREN RIAPOS

14   _____

15                         

16          Taken via Zoom at: Kennesaw, Georgia

17

18

19

20

21

22

23

24   DATE TAKEN:  June 3, 2022

25   REPORTED BY:  ELIZABETH PATTERSON HARVEY, RPR, CCR 2731

KAREN RIAPOS – 06/03/2022

**2**

```
 1   A P P E A R A N C E S:
 2    FOR THE PLAINTIFF:
 3           Alexander J. Higgins
             alex@alexjhiggins.com
 4           Law Offices of Alex J. Higgins
             2200 Sixth Avenue Ste 500
 5           Seattle, Washington  98121
             206.340.4856
 6
             Cody Fenton-Robertson
 7           cody@beanlawgroup.com
             Bean Law Group
 8           2200 Sixth Avenue, Suite 600
             Seattle, Washington  98121
 9           206.522.0618
10
      FOR THE DEFENDANT:
11
             Emma Kazaryan
12           ekazaryan@seyfarth.com
             Seyfarth
13           999 Third Avenue
             Suite 4700
14           Seattle, Washington   98104
             206.946.4910
15
16
17
18
19    * * * * * * *
20
21
22
23
24
25
```

**4**

```
 1                 EXHIBIT INDEX
 2   EXHIBITS FOR IDENTIFICATION            PAGE
 3
     Exhibit 12  December 8-10, 2020 email chain
 4               (BRAND00718-722)                91:13
 5   Exhibit 13  January 5-8, 2021 email chain
                 (BRAND000087-089)               96:5
 6
     Exhibit 14  June 4, 2020 email chain
 7               (BRAND004412)                   110:21
 8   Exhibit 15  March 23 - June 17, 2021 email
                 chain (BRAND001436-447)         114:15
 9
     Exhibit 16  June 24, 2020 emails (BRAND004720,
10               4697, 4702)                     116:21
11   Exhibit 17  June 2020 emails (BRAND004523,
                 4681)                           123:12
12
     Exhibit 18  June 8 - 16, 2020 email chain
13               (BRAND004529-533)               125:21
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                 I N D E X
            DEPOSITION OF KAREN RIAPOS
 2
              EXAMINATION INDEX
 3
     EXAMINATION BY:
 4                                         PAGE:
     ATTORNEY HIGGINS:
 5                                         5:19
 6
                 EXHIBIT INDEX
 7   EXHIBITS FOR IDENTIFICATION          PAGE
 8   Exhibit 1   Defendant's Objections and
                 Responses to Plaintiff's First
 9               Interrogatories and Requests for
                 Production                      25:10
10
     Exhibit 2   November 25 - December 11, 2020
11               email chain (BRAND001777-778)   41:13
12   Exhibit 3   December 13, 2019 email chain
                 (BRAND002513-515)               45:16
13
     Exhibit 4   February 4, 2021 email chain
14               (BRAND001586)                   49:25
15   Exhibit 5   December 4, 2019 email with
                 attachment (BRAND002001-2003)   54:14
16
     Exhibit 6   Draft VINDLY Project Plan
17               (BRAND003612-615)               60:6
18   Exhibit 7   August 4, 2020 email with
                 attachment (BRAND004930-4939)   62:10
19
     Exhibit 8   August 14, 2020 email with
20               attachment (BRAND004986-005003) 72:18
21   Exhibit 9   September 21 - 23, 2020 email
                 (BRAND001637-639)               74:5
22
     Exhibit 10  July 21, 2020 email
23               (BRAND004807-808)               77:20
24   Exhibit 11  September 25-28, 2020 email chain
                 (BRAND001613-616)               82:19
25
```

**5**

```
 1         Kennesaw, Georgia   June 3, 2022
 2              9:00 a.m.
 3                -o0o-
 4
 5      KAREN RIAPOS, witness herein, having been first duly
 6            sworn on oath, was examined and
 7            testified as follows:
 8
 9       THE CERTIFIED COURT REPORTER:  Will
10   counsel please stipulate to the validity and agreement to
11   the remote proceedings today.
12       ATTORNEY HIGGINS:  Yes.  On behalf of
13   plaintiff, Nannette Basa, we stipulate.
14       THE CERTIFIED COURT REPORTER:  And for
15   defendant?
16       ATTORNEY KAZARYAN:  Yes.  On behalf of
17   defendant, Brand Shared Services, we stipulate.
18
19        EXAMINATION
20   BY ATTORNEY HIGGINS:
21   Q   (By Attorney Higgins)  Ms. Riapos, how do you
22   pronounce your last name?
23   A   Riapos.
24   Q   Ms. Riapos.  Okay.  Thank you for that.
25       My name is Alex Higgins.  I represent Nannette
```

KAREN RIAPOS - 06/03/2022

6

1  Basa in this case.
2       Would you please state your name for the
3  record.
4    A  Yes.  Karen Riapos.
5    Q  And spell your last name for the record.
6    A  R-I-A-P-O-S.
7    Q  And where do you work?
8    A  BrandSafway.
9    Q  And what's your job?
10   A  The director of talent acquisition.
11   Q  All right.  We'll talk about your job in a
12  minute.
13      First, let me ask you, have you ever had your
14  deposition taken before?
15   A  No.
16   Q  All right.  So let me explain.  One of the
17  reasons we take a deposition is so that we can understand
18  what your testimony would be if this case goes to trial.
19      Do you understand that?
20   A  Yes.
21   Q  All right.  One of the rules of a deposition
22  that you're getting good at is to say "yes" or "no"
23  orally, as opposed to just shaking your head or nodding.
24      Do you understand the importance of that?
25   A  I do, yes.

7

1    Q  And because your testimony could be important
2  at trial, please do not answer a question if you don't
3  understand it.
4       Is that acceptable?
5    A  Yes.
6    Q  If you don't understand it, please ask me to
7  clarify and I will.
8    A  Okay.
9    Q  All right.  If you need a break at any time,
10  please let me know.  Just finish your answer to the
11  question first, so there's no question sort of hanging --
12   A  Okay.
13   Q  -- and we can take a break.
14      I'm planning to be done by 3:00 p.m. Pacific.
15      Do you have anything that would keep you from
16  staying until 6:00 p.m. Eastern?
17   A  No.
18   Q  Okay.  Great.
19      When I ask you questions, I'm not trying to ask
20  you about attorney-client privileged conversations with
21  your lawyers, with lawyers for BrandSafway.
22      So I'm going to ask you a question like, "What
23  did you do to prepare for your deposition?"  I don't want
24  to tell me, "Well, my lawyer said I should meditate
25  and count backwards from 100," because that's

8

1  attorney-client privilege.
2       Do you understand that?
3    A  I do, yes.
4    Q  So generally speaking, what did you do to
5  prepare for today's deposition?
6    A  Yeah.  I looked through my old emails and just
7  kind of refreshed my memory on some things that had
8  happened, you know, two years ago.
9    Q  Do you remember if you looked at any other
10  documents besides emails?
11   A  No.
12   Q  Did you have an opportunity to talk to the
13  lawyer for BrandSafway, without telling me what you
14  talked about?
15   A  Yes.
16   Q  And about how long did you spend talking to the
17  lawyer?
18   A  A couple hours.
19   Q  All right.  Did you read any transcripts of
20  testimony from Nannette Basa?
21   A  No.
22   Q  Do you have a cell phone that you use for work?
23   A  I do, yes.
24   Q  And is that provided by the company?
25   A  It is, yes.

9

1    Q  All right.  And what is that phone number?
2       I'm not going to call you on it.
3    A  This is embarrassing, but I don't know what the
4  number is.  It's in my email signature, but I don't have
5  it memorized, unfortunately.
6    Q  Okay.  Do you know what the area code is?
7    A  470.
8    Q  All right.  And how long have you been using
9  the current phone, not the phone number, but the physical
10  phone?
11   A  Since December 2019.
12   Q  And what type of phone is it?
13   A  It's an Apple.  An iPhone.
14   Q  An iPhone.  Okay.  Do you back up data?
15      Do you have an iCloud account?
16   A  I think so.
17   Q  Okay.  Have you ever searched that phone for
18  text messages concerning Nannette Basa?
19   A  I didn't, but I believe our IT team did.
20   Q  Okay.
21   A  Yeah.  I'm not sure.
22   Q  That was going to be my next question.
23      Do you remember giving your phone to someone at
24  IT, or is that --
25   A  No, I -- yeah, I didn't, no.

KAREN RIAPOS - 06/03/2022

---

**10**

1  Q   Do you have any understanding as to how they
2  would have searched your phone for text messages?
3  A   No, I don't.
4  Q   Okay.  And other than conversations you've had
5  with your attorney, what is the basis for your
6  understanding that IT may have searched your phone?
7  A   It was just more of an assumption.
8  Q   Okay.  So you don't have any specific memory of
9  your phone being searched?
10  A   No.  No, I don't.
11  Q   All right.  So I assume you've never given over
12  possession of your phone to anyone?
13  A   No, I haven't.
14  Q   And you haven't given your iCloud password to
15  anyone?
16  A   No.
17  Q   Okay.  All right.  Do you know whether you have
18  messages, for instance, text messages between you and
19  Nannette Basa on your phone?
20  A   I don't, no.  I don't know.
21  Q   And you've never looked personally for that?
22  A   I have not, no.
23  Q   All right.  Let's talk about your work history.
24       You've been working at BrandSafway -- excuse
25  me.  I sometimes will say Safway.  Is that okay?

---

**11**

1  A   That's fine.  Yes.
2  Q   You started at BrandSafway in December of 2019,
3  correct?
4  A   Yes.
5  Q   And you started as the director of talent
6  acquisition, right?
7  A   Yes.
8  Q   And what is that job?
9  A   I lead the talent acquisition for corporate
10  functions for North America, so all the recruiting for
11  our corporate and functional roles.
12  Q   Okay.  Do you have a job description?
13  A   I don't think we do, no.
14  Q   Okay.  Your work history is described in an
15  email from Rod Broschinsky back in December of 2019.  I
16  don't need to show it to you, but I'm going to read you
17  portions of it, if you see me looking down at a paper.
18  A   Okay.
19  Q   It says, "Karen has over 20 years of talent
20  acquisition HR management experience.  Most recently
21  Karen held a senior management position in talent
22  acquisition at Keurig Dr. Pepper."
23       Is that true?  Was that your previous job?
24  A   Yes, it was.  Yes.
25  Q   Okay.  And it says, "She also worked for XPO

---

**12**

1  Logistics, Inc., HD Supply, Inc., and Sun Trust Bank."
2       Are those all part of your work history?
3  A   Yes, they are.
4  Q   And were they all talent acquisition or
5  recruiting positions?
6  A   Yes, they were.
7  Q   Do you sometimes call talent acquisition
8  "recruiting?"
9  A   Yeah.  Yes.
10  Q   Okay.  And then it says you have a bachelor's
11  degree in communication studies from the University of
12  Rhode Island; is that true?
13  A   Yes.
14  Q   And what year did you obtain that?
15       I'm not interviewing you for a job, so I can --
16  A   Yeah.  No, no, no, I know.  I'm trying to
17  think.  1997, I believe, was when I finished.
18  Q   And he also writes about you that you have a
19  senior professional in human resources certificate from
20  the Human Resources Certification Institute.
21       I'm not sure if that's quite right, but could
22  you clarify what that is.
23  A   Yeah.  So it's a SPHR certification, which has
24  since expired.
25  Q   Oh, when did you obtain it?

---

**13**

1  A   Back in mid-2000's, I think.  I don't remember.
2  Q   Sometime after the year 2000?
3  A   Yes.
4  Q   Okay.  And why does it expire?
5       Do you have to do continuing credits or
6  something?
7  A   Yes, you have to do continuing credits.
8  Q   And why did you stop doing continuing credits?
9  A   I just got very busy with work and life, so.
10  Q   Okay.  And in terms of getting the SPHR
11  certification, you have to take a series of courses,
12  correct?
13  A   That's correct.
14  Q   And do any of your courses touch on employment
15  discrimination?
16  A   Yes, they did.
17  Q   All right.  And how many hours do you think you
18  spent learning about employment discrimination?
19  A   I don't remember.
20  Q   Was it more than five?
21  A   I don't remember.
22  Q   Okay.  Did any of your courses touch on
23  documenting employment decisions, how to document, why to
24  document, those kinds of things?
25  A   Yes.

KAREN RIAPOS - 06/03/2022

98

1  didn't want to be a recruiter.  She really hadn't thought
2  about it.
3      Q    Do you think she could have done the job?
4      A    No.
5      Q    Why not?
6      A    Just based on a lot of the feedback we had
7  received from managers across the organization, I don't
8  think she would have been successful in those roles.
9      Q    Who were the managers across the organization
10  that provided negative feedback about Nannette?
11     A    Mike Krach, who's an RVP.
12         Jerry Dolly, who was a president of one of our
13  business units.
14         Let's see.  Who else?  Jay Fisher, who was our
15  CIO.
16     Q    Anyone else?
17     A    Not that I can recall off the top of my head,
18  no.
19     Q    Do you have any documents that would help
20  refresh your recollection?
21     A    I don't know.  I'd have to go back and look.
22     Q    Did you take notes of any of these performance
23  issues?
24     A    Not that I remember.  I think we would have
25  talked about them in our one-on-one.

99

1      Q    Okay.  And did you take notes after your
2  one-on-ones with Nannette?
3      A    Not that I remember.
4      Q    Would you have taken notes of any other
5  significant concerns you had with Nannette or
6  conversations you had with Nannette?
7      A    No.  They were mostly emails, so...
8      Q    Do you have any handwritten notes that you keep
9  in your office?
10     A    No.
11     Q    How about typed notes you might keep on your
12  computer?
13     A    No.
14     Q    All right.  We can go through the concerns
15  raised by these people, but I think it makes more sense
16  to wait and do that after the break, after lunch, and
17  then I'll get these other documents uploaded and we can
18  talk about those as well.
19         So shall we just come back at noon?  Top of the
20  hour?
21         ATTORNEY KAZARYAN:  Yes.  And I think you
22  also said you think you will be done then by about 2:00
23  our time?
24         ATTORNEY HIGGINS:  Yes.  I mean, it might
25  not even be that long.  Like I said, Karen is very direct

100

1  and short with her answers, so I don't think it's going
2  to take very long.
3         ATTORNEY KAZARYAN:  Okay.  Sounds good.
4         ATTORNEY HIGGINS:  But I don't want to
5  overpromise and say it should be 1:15 and then it's
6  actually 2:00.  All right?
7         ATTORNEY KAZARYAN:  Okay.  See you at
8  noon.
9         ATTORNEY HIGGINS:  Thanks.
10        (Recess.)
11     Q    (By Attorney Higgins)  Back on the record.
12         Ms. Riapos, are you familiar with a PIP, or a
13  performance improvement plan?
14     A    Yes.
15     Q    Have you ever used that tool in your career in
16  HR?
17     A    Yes, I have.
18     Q    And under what circumstances have you used a
19  PIP?
20     A    I had somebody on my team that was under -- not
21  performing.
22     Q    And about how many times have you used a PIP?
23     A    I don't recall.  A few.
24     Q    Are there other ways to document performance
25  without a formal PIP?

101

1      A    Yes.
2      Q    What are those other ways?
3      A    Email.
4      Q    Other kinds of letters of counseling, or have
5  you ever used things like that?
6      A    No, I haven't.
7      Q    Okay.  But just email --
8      A    Mm-hm.
9      Q    -- to let somebody know that their performance
10  is falling short is one way to document, right?
11     A    Sure.  Yep.
12     Q    And then you could also do a more formal
13  document like a PIP, right?
14     A    Yes.
15     Q    Okay.  So I want to talk about some of the
16  concerns you heard from people.  And I think you
17  identified Jerry Dolly, Jay Fisher, and Mike Krach.
18         Did you think of anybody else while we were on
19  lunch break?
20     A    No.
21     Q    What did you hear from Jerry Dolly?
22     A    He had wanted to hire somebody onto his team
23  and had reached out to Nannette -- I don't know -- maybe
24  in January, and he didn't get any resolution until close
25  to April.

KAREN RIAPOS - 06/03/2022

102

1   Q   And what should she have done, in your opinion?
2   A   I don't recall exactly.  But he had wanted her
3   to get a contractor, I think, from what I remember, or
4   bring somebody onboard or extend an offer or something,
5   and just never heard back from her.
6   Q   What did you say to him?
7   A   To Jerry?
8   Q   Yeah.  Did he call you?  Email you?  Do you
9   remember?
10  A   I think he emailed, and I responded back and
11  let him know we would take care of it.
12  Q   What did you do next?
13  A   I don't remember.  I think we took care of it.
14  We got the offer letter together with the HR team.
15  Q   Do you know who you asked to help?
16  A   No.  But if it was an offer letter, it would
17  have been Kayla Jones.
18  Q   Did you take any notes of your conversations
19  with either Kayla or Jerry about this?
20  A   Not that I recall.
21  Q   Did you discuss the situation with Nannette
22  Basa?
23  A   I think so, yeah.
24  Q   Do you remember what she said?
25  A   No.

103

1   Q   Did you document your discussion with her?
2   A   I don't remember.
3   Q   Okay.  If you did document, in what form would
4   it be?
5   A   It would have been through email.
6   Q   Okay.  Have you ever had complaints about other
7   recruiters not following through and getting a placement
8   done in a timely manner while you've been at BrandSafway?
9   A   At BrandSafway?  Not anybody that's on the team
10  any longer.
11  Q   Nicole Norris is no longer on the team; is that
12  correct?
13  A   Right.  That's correct, but I never received
14  any complaints about her.
15  Q   Who did you receive complaints about?
16  A   Some of the contract recruiters we had on our
17  team.
18  Q   Any other information from Jerry Dolly?
19  A   Not that I recall.
20  Q   Do you remember the position he wanted to hire
21  for?
22  A   I don't.
23  Q   All right.  Would it -- you also mentioned Jay
24  Fisher as somebody who reported to you something negative
25  about Nannette.

104

1       What did he tell you?
2   A   He was raising concerns that a vendor had not
3   been paid.  And when the vendor reached out to Nannette
4   to get resolution, she didn't respond.  She, you know,
5   kind of dismissed him.  And so that dragged on for about
6   four months.
7   Q   Do you remember whether he reported to you that
8   in email, or on the phone, or anything else?
9   A   That was an email, I think, from Jay.
10  Q   Do you remember having a conversation with him
11  about it?
12  A   Well, yeah.  After the email, he called me.
13  Q   Okay.  What did he say?
14  A   He explained what had happened, so I let him
15  know that we would go ahead and get this vendor paid.
16  Q   What did you do next?
17  A   I called AP.
18  Q   Who did you speak to at AP?
19  A   I don't remember.  Whoever the person was at
20  the time.
21  Q   And was your intervention successful in getting
22  payment made?
23  A   We did, yes.
24  Q   Do you know how long it took after you called
25  AP?

105

1   A   Maybe a week.  I don't remember.
2   Q   Did you report back to Jay that you had handled
3   it?
4   A   Yes.
5   Q   Did you do that in email, or orally over the
6   phone?
7   A   I don't remember.
8   Q   You guys use instant messaging there?
9   A   Yeah, sometimes.
10  Q   Is there a messaging feature through Teams?
11  A   Yeah, there is.
12  Q   Do you use that?
13  A   Yeah, sometimes.
14  Q   How frequently, once a day?
15  A   It depends on the person.  I don't use it too
16  regularly, but it depends on who the manager is.
17  Q   I guess I'm just saying, in your use, are you
18  sending messages through Teams at least once a day?
19  Twice a week?
20      Give me sort of a --
21  A   Maybe four or five times a week.
22  Q   Okay.  Did you tell Nannette Basa about the
23  feedback you had received from Jay about this vendor?
24  A   Yes.
25  Q   Do you remember the vendor's name?

Exhibit 6

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4

5    NANNETTE BASA,                  )
                                     )
6                      Plaintiff,    )
                                     )
7    vs.                             ) No. 2:21-cv-00754-MLP
                                     )
8    BRAND SHARED SERVICES, LLC,     )
                                     )
9                      Defendant.    )
     _____)

10

11

12

13

14        ORAL VIDEO DEPOSITION OF MICHELLE ROMAN

15            WEDNESDAY, SEPTEMBER 7, 2022

16

17

18

19        THE ORAL VIDEO DEPOSITION OF MICHELLE ROMAN,

20   produced as a witness at the instance of the Plaintiff,

21   was taken in the above-styled and -numbered cause on the

22   7th day of September, 2022, from 9:01 a.m. to 11:36 a.m.

23   Pacific Time.  The court reporter was Nor Monroe,

24   Certified Court Reporter for the State of Washington.

25   All participants appeared via Zoom videoconference.

Page 2

```
 1                  APPEARANCES
 2
 3  FOR PLAINTIFF
 4        ALEX J. HIGGINS
          alex@alexjhiggins.com
 5        LAW OFFICES OF ALEX J. HIGGINS
          2200 6th Avenue
 6        Suite 500
          Seattle, Washington  98121-1844
 7        Phone:  (206) 340-4856
 8        CODY FENTON-ROBERTSON
          cody@beanlawgroup.com
 9        BEAN LAW GROUP
          2200 6th Avenue
10        Suite 500
          Seattle, Washington  98121-1844
11        Phone:  (206) 522-0618
12
13  FOR DEFENDANT
14        HELEN MCFARLAND
          hmcfarland@seyfarth.com
15        EMMA KAZARYAN
          ekazaryan@seyfarth.com
16        SEYFARTH SHAW LLP
          999 3rd Avenue
17        Suite 4700
          Seattle, Washington  98104-4041
18        Phone:  (206) 946-4978
19
20
21  ALSO PRESENT:
22        (None)
23
24
25
```

Page 4

EXHIBITS
(Newly marked)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 19 | Email with Attachment -- "Recruiting Process" -- 12/4/2019 -- BRAND002001 through 2003 | 45 |
| Exhibit 20 | Email Thread -- "RE: Accommodations Statement on job postings" -- BRAND003104 through 3113 | 57 |
| Exhibit 21 | Email Thread -- "RE: Supply Chain Travel Management Position" -- BRAND005097 through 5098 | 61 |
| Exhibit 22 | Email Thread -- "RE: Interviews-Supply Chain" -- BRAND005096 | 61 |
| Exhibit 23 | Chat Printout -- BRAND000090 | 103 |
| Exhibit 24 | Email from Michelle Roman -- "ACTION NEEDED: HR Listening Sessions" -- 7/24/2020 -- BRAND004855 | 64 |

```
19        *     *     *     *     *     *     *     *
```

Page 3

```
 1                I N D E X
 2
 3  WITNESS                               PAGE
```

| | | |
|---|---|---|
| Title Page | | 1 |
| Appearances | | 2 |
| Index | | 3 |
| MICHELLE ROMAN | | |
| EXAMINATION BY MR. HIGGINS | | 5 |
| EXAMINATION BY MS. MCFARLAND | | 109 |
| Deposition Concluded | | 110 |
| Court Reporter's Certificate | | 111 |
| Changes and Signature | | 112 |

```
14            *     *     *     *     *
```

EXHIBITS
(Previously marked; not included with transcript)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Defendant's Objections and Responses to Plaintiff's First Interrogatories and Requests for Production | 74 |
| Exhibit 8 | Email and Attachment -- "Updated HR Org Charts" -- 8/14/20 -- BRAND004986 through 5003 | 28 |
| Exhibit 9 | Email Thread -- "Re: Thank you for session" -- BRAND001637 through 1639 | 68 |

```
                    continued
```

Page 5

 1      (WEDNESDAY, SEPTEMBER 7, 2022)
 2         (9:01 a.m.)
 3      (Ms. Kazaryan not present.)
 4         MICHELLE ROMAN,
 5  having been called as a witness herein, having been
 6  first duly sworn/affirmed, was examined and testified as
 7  follows:
 8         EXAMINATION
 9  BY MR. HIGGINS:
10      Q.  Good morning, Miss Roman.  My name is Alex
11  Higgins.  I represent Nannette Basa in this case.
12         Would you state your name for the record?
13      A.  Michelle Roman.
14      Q.  Could you also state your home address?
15      A.  8019 Peaceful Circle, Sanford, Florida 32771.
16      Q.  Have you ever had your deposition taken
17  before?
18      A.  No.
19      Q.  Well, lemme explain to you a few things.
20  First of all, it's not an endurance test, and if you
21  need to use the bathroom, get up and stretch your legs,
22  go ahead and ask me, and that's fine, so long as you
23  finished answering.  So don't take my question and take
24  a break; but after you answer, say, "I'd like to take a
25  break."  Is that clear?

MICHELLE ROMAN – 09/07/2022

6

1    A.  Yes.
2    Q.  And then also --
3        (Ms. Kazaryan now present.)
4    Q.  -- please do not answer any question that you
5  don't understand.  Is that okay?
6    A.  Yes.
7    Q.  Do you understand one of the reasons for this
8  deposition would be to understand your testimony before
9  trial, and so if you testified at trial differently, I
10  would be entitled to point out the differences between
11  your testimony under oath here today and your testimony
12  at trial.
13    A.  I understand.
14    Q.  All right.  Have you ever testified at an
15  arbitration before?
16    A.  No.
17    Q.  Have you ever testified at a trial?
18    A.  No.
19    Q.  All right.  Have you hired the s- -- Seyfarth
20  Shaw firm to represent you today?
21    A.  Yes.
22    Q.  And when did that agreement for them to
23  represent you take place; how long ago?
24    A.  I don't recall exactly when, a date,
25  specifically, but. . . .

7

1    Q.  Was it before you were served with subpoena or
2  after?
3    A.  Before.
4    Q.  Okay.  And you did not want them to accept a
5  subpoena for you; is that correct?
6        Well, lemme put it -- you look confused by
7  my question.  We served you personally at your house --
8    A.  Yes.
9    Q.  -- left a subpoena with your husband; correct?
10        (Simultaneous talking.)
11    A.  Yes.
12    Q.  Did you -- were you asked whether you wanted
13  to accept -- have the attorneys accept service for you
14  beforehand?
15    A.  I don't recall that, no.
16    Q.  Okay.  So you never told anyone "I don't want
17  to accept service."  Or 'scuse me.  "I don't want my
18  attorneys to accept service for me."
19    A.  No.
20    Q.  All right.  Are you willing to give your
21  attorneys permission to accept service of a subpoena for
22  trial if we wanna call you as a witness in this case?
23    A.  Yes.
24    Q.  All right.
25        MR. HIGGINS:  And -- and Helen, would you

8

1  stipulate to that on the record?
2        MS. MCFARLAND:  Yes.
3    Q.  (BY MR. HIGGINS)  All right.  What did --
4  Ms. Roman, what did you do to prepare for the deposition
5  today?
6    A.  Well, I, I mean, obviously thought back, you
7  know, through, you know, what m- -- questions might come
8  up as the course of this, and tried to recall, you know,
9  the activities leading up to . . . you know, to the
10  discussion with Ms. Basa.  And then obviously consulted
11  with my attorney.
12    Q.  Okay.  And without telling me what you talked
13  to the attorney about, tell me:  How long did you spend
14  talking to the attorneys for Brand?
15    A.  Can I ask a clarification question?
16    Q.  Sure.
17    A.  It -- are you talking about upon receipt of
18  the subpoena?
19    Q.  Yes, I -- what I'm talking about is how much
20  time did you spend talking about the case with the
21  attorneys to help you understand where your testimony
22  might fit in and to help you prepare in thinking about
23  today's deposition?
24    A.  Mm, I would say about three hours.
25    Q.  Okay.  And I assume it was all by Zoom or

9

1  phone; it was not in person?
2    A.  Correct.
3    Q.  Did you review any documents?
4    A.  No.
5    Q.  Did you review any deposition transcripts?
6    A.  No.
7    Q.  Okay.  I'm gonna refer to the defendant in
8  this case as "Brand" instead of "BrandSafway."  Is that
9  all right with you?
10    A.  Yes.
11    Q.  Is that how you all commonly refer to the
12  company?
13    A.  Some do.  I -- I always refer to it as
14  "BrandSafway."  But "Brand" is also fine.
15    Q.  All right.  When you worked for Brand, did you
16  have a cell phone that you used for work purposes?
17    A.  Yes.
18    Q.  And you no longer have that phone?
19    A.  Correct.
20    Q.  What type of phone was it?
21    A.  It was an iPhone.
22    Q.  Okay.  And I assume you used it for work phone
23  calls, but also did you use it for work texting?
24    A.  Yes.
25    Q.  All right.  Was that, you know, once a day?

MICHELLE ROMAN - 09/07/2022

10

1  Twice a day?  I mean, how -- how many times a day would
2  you have texts about work?
3      A.  It wasn't often.  I -- it wasn't often.
4      Q.  So give me a -- give me sort of a weekly
5  average or monthly average or something you can -- you
6  can give me a --
7          (Simultaneous talking.)
8      A.  For work, I would say, you know, three/four
9  times a week, maybe.
10     Q.  Okay.  And what did you do with the phone when
11 you left Brand?
12     A.  I returned the company asset.
13     Q.  Did you ever search for text messages on your
14 phone concerning Nannette Basa?
15     A.  Yes.
16     Q.  When did you do that?
17     A.  Couple of months ago.  I don't remember the
18 exact date, but it was a few months ago.
19     Q.  And it was af- -- 'scuse me -- while you were
20 still working at Brand.
21     A.  Correct.
22     Q.  And you worked at Brand until August -- what
23 date in August did --
24         (Simultaneous talking.)
25     A.  Until July 15th.

11

1      Q.  Oh, July 15th.  Excuse me.  Okay.
2          So it was sometime in June or July that you
3  looked at your phone for text messages?
4      A.  No, that was b- -- before that.
5      Q.  Okay.
6      A.  It was earlier in the year.
7      Q.  Okay.  Earlier in the year.
8      A.  Mm-hmm.
9      Q.  And -- and did you find anything about
10 Nannette Basa?
11     A.  I found a few things, and whatever I found I
12 turned over to legal counsel.
13     Q.  Okay.  And that was counsel for Brand, who's
14 here at the deposition today.
15     A.  Correct.
16     Q.  And did you -- did you notice that some older
17 texts were, you know -- sort of had gone -- well, I'll
18 put it a different way.  Sorry.
19         Did you have settings on your phone to get rid
20 of old text messages that were -- you know, after a year
21 or six months or 30 days or something like that?
22     A.  I don't know that, 'cause I never configured
23 the phone specifically for that, so. . . .
24     Q.  What's the oldest text messages you found when
25 you were searching earlier this year in 2022?

12

1      A.  I don't recall.
2      Q.  Do you know if there were any text messages
3  from around the time in late 2020, when Nannette Basa
4  was laid off?
5      A.  I don't recall.
6      Q.  Do you recall what the -- few text
7  messages you found that you thought might be relevant
8  were about?
9      A.  I don't recall.
10     Q.  Did they have the name "Nannette" or "Basa" in
11 them?
12     A.  It -- they would have if -- 'cause that's how
13 I searched it.  So if I found 'em, they would have --
14 they would have those names, yes.
15     Q.  So the search terms you used were "Nannette"
16 and then "Basa."
17     A.  Correct.
18     Q.  Separate -- two separate searches?
19     A.  Three.  I would have put the full name --
20     Q.  Okay.  Got it.
21     A.  -- name "Nannette" and the name "Basa."
22     Q.  And -- and you don't remember if they were
23 while she was still working there or after she left,
24 those text messages?
25     A.  I don't recall.

13

1      Q.  Okay.  Prior to the year 2022, were you ever
2  asked to look at your phone for text messages?  About
3  this case?
4      A.  I -- I don't recall.
5      Q.  Did you ever give your phone to anyone to
6  search for text messages?
7      A.  No.
8      Q.  Do you know if your -- your phone's text
9  messages can be searched remotely, without your
10 permission?
11     A.  I don't know.
12     Q.  Did you ever give permission to anyone to
13 search your phone remotely?  Give them --
14         (Simultaneous talking.)
15     Q.  -- your -- maybe your password to the iCloud
16 or something like that?
17     A.  No.  I don't recall that.
18     Q.  Did you sync up your phone to the cloud so
19 that, you know, your text messages were kept -- your
20 iMessages were kept on the . . . on your computer?
21     A.  I did not specifically do that, so unless the
22 phone was configured that way, I did not specifically do
23 that.
24     Q.  Okay.  You'll be happy to know that's all the
25 questions I have about your phone and technology.

MICHELLE ROMAN – 09/07/2022

102

1 recruiting anymore?
2    A.  I don't recall having that conversation.
3    Q.  Based on your HR experience, do you think that
4 is a good idea, to document that kind of discussion with
5 an employee?
6       MS. MCFARLAND:  Objection:  Argumentative.
7    Q.  (BY MR. HIGGINS)  Just asking for what you
8 think's a good idea.
9    A.  'Kay.  So ideally . . . ideally we prob'ly
10 could have had it in writing.  From my understanding is
11 that conversation happened way before any of this,
12 so . . . but I don't recall having the specific
13 conversation at the time, no.
14    Q.  Okay.  Did she ever -- did -- did Karen ever
15 tell you prior to September of 2020 that she planned to
16 get an MSP on board and then let Nannette go, regardless
17 of whether there were any layoffs?
18    A.  I don't recall that.
19    Q.  Would you remember something like that?
20       Well, I- -- lemme put it this way:  Did she
21 ever tell you she wanted to let Nannette go prior to the
22 layoffs?
23    A.  No, not to my recollection.
24    Q.  Okay.  I'm showing you now what is probably
25 going to be the last exhibit I'm gonna show you today,

103

1 so you may have a celebratory drink of water, because
2 we're almost done.
3    A.  Is that 23?
4    Q.  It's 23.
5    A.  Okay.  Lemme open it.
6       (Brief pause.)
7    A.  Sorry.  Hold on.  Here we go.  Okay.  I'm
8 opening it now.
9       Okay.
10    Q.  So . . . what is -- what kind of document is
11 this?
12    A.  I don't know if this is a Teams chat or -- but
13 it's definitely a chat.
14    Q.  Was there -- okay.  So lemme ask you about the
15 kinds of technology you used while you were at Brand.
16       By the way, this is Bates-stamp number 90.
17    A.  Mm-hmm.
18    Q.  Did you -- do you use the chat feature within
19 Teams?
20    A.  Yes.  It would have been Teams or it would
21 have been Skype for Business, depending on the time
22 line.  But I think this one was Teams.
23    Q.  Did you replace Skype for Business with Teams
24 at some point?
25    A.  I don't recall the time frame of that, but

104

1 this may have been well before that, yeah.
2    Q.  Was there any other form of instant messaging
3 at Brand used to communicate about business matters?
4    A.  Not that I'm aware of.
5    Q.  How often did you use this chat feature to
6 communicate with others while you were at Brand?  Was
7 this a daily thing?
8    A.  Yes.
9    Q.  Multiple times a day?
10    A.  Yes.
11    Q.  What -- why would you do it in a chat versus
12 an email?  What was the -- did you have a criteria in
13 mind for when you'd use one and not the other?
14    A.  Yeah, yeah, when I w- -- had quick questions
15 or just needed a -- you know, to touch base with someone
16 very quickly, I would use chat.
17    Q.  Okay.  All right.  Did you ever go back and
18 search your chat history like you ch- -- checked your
19 phone for text messages about Nannette Basa?
20    A.  Yes, I did.
21    Q.  Okay.  And was that, again, in early 2022?
22    A.  I don't remember the timing, but it was ar- --
23 it was at the same time I would have done the phone.
24    Q.  Okay.  So I can't really tell who's writing
25 what in this.  There's a -- there's something at the top

105

1 there, really small print, the first thing, "do you have
2 a copy of the severance agreement we gave nannette?"
3 You see that?
4    A.  Yes.
5    Q.  And it says a k- -- a clue here at the top is
6 "Conversation with Jones, Kayla."  Do you -- do you know
7 if that's her?
8    A.  What do you mean?
9    Q.  What's that?
10    A.  What do you mean, "if that's her"?  What do
11 you mean?
12    Q.  Well, who wrote -- I can't tell from reading
13 this -- I'm not experienced with these kinds of
14 communication platforms.  So who wrote "do you have a
15 copy of severance agreement we gave --"
16       (Simultaneous talking.)
17    A.  I wrote that to -- I wrote that to Kayla.
18    Q.  You wrote that to Kayla.  Got it.  Okay.
19    A.  Right.
20    Q.  And then --
21    A.  Yes.
22    Q.  -- somehow there's a conversation with Karen
23 Riapos.
24    A.  Yes.
25    Q.  And "BTW --" by the way --

Exhibit 7

## Cody Fenton-Robertson

| | |
|---|---|
| **From:** | Kazaryan, Emma J. <ekazaryan@seyfarth.com> |
| **Sent:** | Tuesday, June 21, 2022 5:59 PM |
| **To:** | Alexander Higgins; Cody Fenton-Robertson |
| **Cc:** | Macan, Valerie; McFarland, Helen M. |
| **Subject:** | RE: Discovery Update |

Hi Alex,

I'm still working to get that email production completed by the end of June.  We have followed up regarding the messages and do not have any additional messages to produce.

Have you received Nanette's personnel file?  I was advised that we would have it by Monday June 13 at the latest, but I have not seen it come through.

Best,
Emma

**Emma Kazaryan** | Associate | Seyfarth Shaw LLP
999 Third Avenue | Suite 4700 | Seattle, Washington 98104-4041
Direct: +1-206-946-4978 | Mobile: +1-206-883-4584 | Fax: +1-206-299-9664
ekazaryan@seyfarth.com | www.seyfarth.com
**From:** Alexander Higgins <alex@alexjhiggins.com>
**Sent:** Tuesday, June 21, 2022 12:44 PM
**To:** McFarland, Helen M. <hmcfarland@seyfarth.com>; Cody Fenton-Robertson <cody@beanlawgroup.com>; Kazaryan, Emma J. <ekazaryan@seyfarth.com>
**Cc:** Macan, Valerie <vmacan@seyfarth.com>
**Subject:** Discovery Update

**This Message Is From an External Sender**
This message came from outside your organization.

Emma and Helen,

We will schedule additional depositions when Defendant completes its discovery.  Can you please provide an update on that?

We understood from our CR 37 Conference that you expected the email production from Plaintiff's 2nd set of requests to be completed by the end of June.

Additionally, we understood that you were rechecking the text messages and Teams messages to determine whether messages were preserved and whether there was anything responsive.  When will that be completed?

We would like to get the next set of depositions on the calendar but we need to understand where we are with docs in order to do that.

Thanks,

Alex

*Law Offices of Alex J. Higgins*
*Labor & Employment Law*
2200 Sixth Ave., Suite 500
Seattle, WA 98121
206.340.4856
206.518.3698 (mobile)
206.260.8803 (fax)
alex@alexjhiggins.com
www.alexjhiggins.com [alexjhiggins.com]

CONFIDENTIALITY NOTICE: This communication is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this communication by someone other than the intended addressee or its designated agent is strictly prohibited. If you have received this communication in error, please notify this firm immediately by reply to this communication.



CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** "McFarland, Helen M." <hmcfarland@seyfarth.com>
**Date:** Thursday, June 16, 2022 at 9:59 AM
**To:** Cody Fenton-Robertson <cody@beanlawgroup.com>, "Kazaryan, Emma J." <ekazaryan@seyfarth.com>
**Cc:** Alexander Higgins <alex@alexjhiggins.com>, "Macan, Valerie" <vmacan@seyfarth.com>
**Subject:** RE: Basa/Brand - dep notices for 6/20

Thanks Cody and Alex.  No, we have not been able to connect with Daniel to obtain his availability.  We will just be producing Michelle on Monday.

Helen

**Helen M. McFarland** | Partner | Seyfarth Shaw LLP
999 Third Avenue | Suite 4700 | Seattle, Washington 98104-4041
Direct: +1-206-946-4923 | Fax: +1-206-299-9974
hmcfarland@seyfarth.com | http://www.seyfarth.com
**From:** Cody Fenton-Robertson <cody@beanlawgroup.com>
**Sent:** Thursday, June 16, 2022 9:51 AM
**To:** McFarland, Helen M. <hmcfarland@seyfarth.com>; Kazaryan, Emma J. <ekazaryan@seyfarth.com>
**Cc:** 'Alexander Higgins (alex@alexjhiggins.com)' <alex@alexjhiggins.com>; Macan, Valerie <vmacan@seyfarth.com>
**Subject:** RE: Basa/Brand - dep notices for 6/20

**This Message Is From an External Sender**

This message came from outside your organization.

Apologies, I got Ms. Roman and Ms. Newman swapped. My mistake, I will send a new notice. I also thought that we had Mr. McDaniel lined up for Monday—is that not correct?



CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**From:** McFarland, Helen M. <hmcfarland@seyfarth.com>
**Sent:** Thursday, June 16, 2022 9:44 AM
**To:** Cody Fenton-Robertson <cody@beanlawgroup.com>; Kazaryan, Emma J. <ekazaryan@seyfarth.com>
**Cc:** 'Alexander Higgins (alex@alexjhiggins.com)' <alex@alexjhiggins.com>; Macan, Valerie <vmacan@seyfarth.com>
**Subject:** RE: Basa/Brand - dep notices for 6/20

Cody,

We are not producing Meg Newman and Daniel McDaniel on Monday.  They are not available and less than two business days' notice (with Monday a holiday) is insufficient and unreasonable.  We can only assume you are doing this to try to get our attention without really intending to proceed on that day.  We also are already producing Michelle Roman for deposition on Monday.

We have told you that we are working to obtain dates and we will provide them as soon as we can.

Helen

**Helen M. McFarland** | Partner | Seyfarth Shaw LLP
999 Third Avenue | Suite 4700 | Seattle, Washington 98104-4041
Direct: +1-206-946-4923 | Fax: +1-206-299-9974
hmcfarland@seyfarth.com | www.seyfarth.com
**From:** Cody Fenton-Robertson <cody@beanlawgroup.com>
**Sent:** Thursday, June 16, 2022 9:39 AM
**To:** Kazaryan, Emma J. <ekazaryan@seyfarth.com>; McFarland, Helen M. <hmcfarland@seyfarth.com>
**Cc:** 'Alexander Higgins (alex@alexjhiggins.com)' <alex@alexjhiggins.com>; Macan, Valerie <vmacan@seyfarth.com>
**Subject:** Basa/Brand - dep notices for 6/20

**This Message Is From an External Sender**

This message came from outside your organization.

Good morning Emma and Helen,

Dep notices for Monday are attached.

Best,
Cody

**Cody Fenton-Robertson** | Associate Attorney
OFFICE **206.522.0618** | FAX **206.524.3751** | DIRECT **206.602.6354**



2200 SIXTH AVENUE
SUITE 500
SEATTLE, WA 98121

CONFIDENTIALITY NOTICE: This communication is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this communication by someone other than the intended addressee or its designated agent is strictly prohibited. If you have received this communication in error, please notify this firm immediately by reply to this communication and delete the email.



CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

Exhibit 8

**Conversation between Nannette's iPhone (+14259510818) and Rod (9852102709)**

4/5/2018 1:31 PM (Viewed 4/5/2018 1:32 PM)

Rod (9852102709)

I'm in the weeds with Merit. Do you have anything pressing? Wait .... are you still skiing?

4/5/2018 1:33 PM

Nannette's iPhone (+14259510818)

Nope I'm good

4/5/2018 1:33 PM

Rod (9852102709)

Good deal.

4/5/2018 1:33 PM

Rod (9852102709)

Thx

4/24/2018 5:09 PM

Nannette's iPhone (+14259510818)

Rod, relax on the temp labor. as long as the other E&I HR members do what Leslie Mayo does, we should easily hit our target $. I was very creative on how I got to Corp savings and Dan mentioned to me on a call with C&I that Finance approved my justification. Feel free to call me, but I think we got this!and may also have high chances of exceeding our goals

5/17/2018 5:34 AM (Viewed 5/24/2018 1:35 PM)

Rod (9852102709)

I'm doing an org chart for a meeting next week. We've been asked to add pictures. Can you send me a selfie please?

5/30/2018 5:13 AM (Viewed 5/30/2018 5:18 AM)

Rod (9852102709)

Do you want to carpool to the office with Casey and I?

5/30/2018 5:18 AM

Nannette's iPhone (+14259510818)

Yes

5/30/2018 5:21 AM

Rod (9852102709)

Ok. Having some breakfast. Leaving in 15idh.

5/30/2018 5:21 AM

Rod (9852102709)

Ish

5/30/2018 5:21 AM

Nannette's iPhone (+14259510818)

We are downstairs

5/30/2018 5:22 AM

Rod (9852102709)

Ok. Where?

5/30/2018 4:24 PM (Viewed 5/30/2018 4:26 PM)

Rod (9852102709)

Just got here. 15 min?

5/30/2018 4:26 PM

Nannette's iPhone (+14259510818)

2/7/2019 1:15 PM (Viewed 2/7/2019 3:44 PM)

Rod (9852102709)



2/7/2019 4:13 PM

Nannette's iPhone (+14259510818)

Photo circulating

2/7/2019 4:15 PM

Rod (9852102709)



2/7/2019 4:16 PM

Nannette's iPhone (+14259510818)

You know a photo of Rod eating a banana might be useful to Dan Stanley one day 😇

2/7/2019 4:19 PM

Rod (9852102709)

So much trouble!

2/7/2019 4:20 PM

Nannette's iPhone (+14259510818)

I like you, that's why I did it

2/8/2019 6:44 PM

Nannette's iPhone (+14259510818)

Don't forget to scan and send me your notes for the VMS

2/8/2019 6:45 PM (Viewed 2/11/2019 9:14 AM)

Rod (9852102709)

I know sorry. Was at work until 6:30 and totally forgot. Will be in tomorrow.

2/14/2019 1:34 PM

Nannette's iPhone (+14259510818)

Skype is being difficult with me

3/26/2019 12:47 PM

Nannette's iPhone (+14259510818)

Do you want me to check with Priscilla and Roald about interviewing Lauren?

3/26/2019 1:17 PM

Rod (9852102709)

No not yet

3/26/2019 1:18 PM

Nannette's iPhone (+14259510818)

Ok, just didn't want you to think that I forgot about the Comp Analyst 🙂

3/26/2019 1:20 PM

Rod (9852102709)

You have me set up for a call tomorrow, yes?

3/26/2019 1:20 PM

Nannette's iPhone (+14259510818)

Yes

BASA_000848

Ahhhhhh got it.

10/15/2020 3:23 PM

Nannette's iPhone (+14259510818)

You are awesome

Rod (9852102709)

10/15/2020 3:24 PM

Thank you for thinking about me. You, my friend, are the awesome one.

Rod (9852102709)

10/15/2020 3:24 PM



Rod (9852102709)

10/15/2020 3:24 PM

I'll totally use the notepad..

10/15/2020 3:25 PM

Nannette's iPhone (+14259510818)

I know I haven't gotten the cost saving this year in VNDLY, but hope Meg and you are still pleased with the worked i have done

10/15/2020 3:26 PM

Nannette's iPhone (+14259510818)

I looked at is of having at least 60% of the spend in VNDLY. That is pretty good for not much help!

10/15/2020 3:28 PM

Nannette's iPhone (+14259510818)

Thanks for letting me work on the program

Rod (9852102709)

10/15/2020 3:28 PM

I haven't even had time to look. Hoping to review a bit tomorrow. It's been a crazy year! To say the least.

Rod (9852102709)

10/15/2020 3:28 PM

For sure. You are quite the SME!

10/15/2020 3:29 PM

Nannette's iPhone (+14259510818)

Oh, I'll have to send you the article they did on my family

Rod (9852102709)

10/15/2020 3:29 PM (Viewed 10/15/2020 3:30 PM)

Thank you for all you do Nannette. I haven't really been involved in the talent business much at all.

Rod (9852102709)

10/15/2020 3:29 PM (Viewed 10/15/2020 3:30 PM)

Would love to see it..

10/15/2020 3:30 PM

Nannette's iPhone (+14259510818)

https://www.millcreekbeacon.com/story/2020/09/18/news/remote-learning-is-a-fit-for-local-family/11689.html

You have 495 total messages and 21 total images.

BASA_000869

Exhibit 9

**Cody Fenton-Robertson**

| | |
|---|---|
| **From:** | Alexander Higgins <alex@alexjhiggins.com> |
| **Sent:** | Tuesday, September 13, 2022 2:51 PM |
| **To:** | Kazaryan, Emma J.; Cody Fenton-Robertson |
| **Cc:** | McFarland, Helen M.; Macan, Valerie |
| **Subject:** | Re: Basa v. Brand -- CR 37 on Spoliation |

Emma and Helen,

Your witnesses have consistently testified that Brand did <u>nothing</u> to preserve text messages about Nannette Basa.  By contrast, our client has produced many pages of responsive texts – some of which were sent to Brand's speaking agents, such as Rod Broschinsky.

Brand has not produced a single text message from any of its Company-issued cell phones.

This is a clear violation of Brand's legal obligations.  See, e.g., *Stinson v. City of New York*, 2016 WL 54684, at *5 (S.D.N.Y. Jan. 5, 2016) (rejecting the employer's argument that it was under no obligation to preserve messages kept on employees' personal electronic devices); *Alter v. Rocky Point Sch. Dist.*, No. 13 Civ. 1100, 2014 WL 4966119, at *10 (E.D.N.Y. Sept. 30, 2014) ("However, to the extent that the School District employees had documents related to this matter, the information should have been preserved on whatever devices contained the information (e.g. laptops, cellphones, and any personal digital devices capable of ESI storage).")

Your witnesses have also testified that Microsoft Teams (and Skype for Business) were routinely used for business communications.  Despite this, you have only produced 1 page of a single Teams message concerning Ms. Basa.

Finally, Mr. Broschinsky testified earlier today that he likely had notes and performance reviews of Ms. Basa in his supervisory folder, which he left with Brand, but nothing has been produced.

We believe that we must file a motion concerning this obvious spoliation.  It is probably worth having a final conference about this before we file to see if the issue can be resolved.  When are you available?

-Alex and Cody

*Law Offices of Alex J. Higgins*
*Labor & Employment Law*
2200 Sixth Ave., Suite 500
Seattle, WA 98121
206.340.4856
206.518.3698 (mobile)
206.260.8803 (fax)
alex@alexjhiggins.com
www.alexjhiggins.com

CONFIDENTIALITY NOTICE: This communication is intended for the sole use of the individual and entity to whom it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. You are hereby notified that any dissemination, distribution or duplication of this communication by someone other than the intended addressee or its designated agent is strictly prohibited. If you have received this communication in error, please notify this firm immediately by reply to this communication.