Exhibit 5

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2            FOR THE WESTERN DISTRICT OF WASHINGTON

3                           AT SEATTLE

4    _____

5    NANNETTE BASSA,                      )
                                          )
6            Plaintiff,                    )
                                          )
7    vs.                                  )No.2:21-CV-007540-MLP
                                          )
8    BRAND SHARED SERVICES, LLC,          )
                                          )
9            Defendant.                    )
                                          )
10   _____

11   REMOTE VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

12                              OF

13                        KAREN RIAPOS

14

15   _____

16            Taken via Zoom at: Kennesaw, Georgia

17

18

19

20

21

22

23

24   DATE TAKEN:  June 3, 2022

25   REPORTED BY:  ELIZABETH PATTERSON HARVEY, RPR, CCR 2731

## Page 2

```
 1   A P P E A R A N C E S:
 2     FOR THE PLAINTIFF:
 3             Alexander J. Higgins
               alex@alexjhiggins.com
 4             Law Offices of Alex J. Higgins
               2200 Sixth Avenue Ste 500
 5             Seattle, Washington  98121
               206.340.4856
 6
               Cody Fenton-Robertson
 7             cody@beanlawgroup.com
               Bean Law Group
 8             2200 Sixth Avenue, Suite 600
               Seattle, Washington  98121
 9             206.522.0618
10
       FOR THE DEFENDANT:
11
               Emma Kazaryan
12             ekazaryan@seyfarth.com
               Seyfarth
13             999 Third Avenue
               Suite 4700
14             Seattle, Washington   98104
               206.946.4910
15
16
17
18
19     * * * * * * *
20
21
22
23
24
25
```

## Page 3

```
 1               I N D E X
           DEPOSITION OF KAREN RIAPOS
 2
           EXAMINATION INDEX
 3
     EXAMINATION BY:
 4                                            PAGE:
     ATTORNEY HIGGINS:
 5                                            5:19
 6           EXHIBIT INDEX
 7   EXHIBITS FOR IDENTIFICATION            PAGE
 8   Exhibit 1   Defendant's Objections and
                 Responses to Plaintiff's First
 9               Interrogatories and Requests for
                 Production                  25:10
10
     Exhibit 2   November 25 - December 11, 2020
11               email chain (BRAND001777-778) 41:13
12   Exhibit 3   December 13, 2019 email chain
                 (BRAND002513-515)           45:16
13
     Exhibit 4   February 4, 2021 email chain
14               (BRAND001586)               49:25
15   Exhibit 5   December 4, 2019 email with
                 attachment (BRAND002001-2003) 54:14
16
     Exhibit 6   Draft VINDLY Project Plan
17               (BRAND003612-615)           60:6
18   Exhibit 7   August 4, 2020 email with
                 attachment (BRAND004930-4939) 62:10
19
     Exhibit 8   August 14, 2020 email with
20               attachment (BRAND004986-005003) 72:18
21   Exhibit 9   September 21 - 23, 2020 email
                 chain (BRAND001637-639)     74:5
22
     Exhibit 10  July 21, 2020 email
23               (BRAND004807-808)           77:20
24   Exhibit 11  September 25-28, 2020 email chain
                 (BRAND001613-616)           82:19
25
```

## Page 4

```
 1                EXHIBIT INDEX
 2   EXHIBITS FOR IDENTIFICATION            PAGE
 3
     Exhibit 12  December 8-10, 2020 email chain
 4               (BRAND00718-722)            91:13
 5   Exhibit 13  January 5-8, 2021 email chain
                 (BRAND000087-089)           96:5
 6
     Exhibit 14  June 4, 2020 email chain
 7               (BRAND004412)               110:21
 8   Exhibit 15  March 23 - June 17, 2021 email
                 chain (BRAND001436-447)     114:15
 9
     Exhibit 16  June 24, 2020 emails (BRAND004720,
10               4697, 4702)                 116:21
11   Exhibit 17  June 2020 emails (BRAND004523,
                 4681)                       123:12
12
     Exhibit 18  June 8 - 16, 2020 email chain
13               (BRAND004529-533)           125:21
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1       Kennesaw, Georgia  June 3, 2022
 2            9:00 a.m.
 3              -o0o-
 4
 5    KAREN RIAPOS, witness herein, having been first duly
 6         sworn on oath, was examined and
 7              testified as follows:
 8
 9       THE CERTIFIED COURT REPORTER:  Will
10   counsel please stipulate to the validity and agreement to
11   the remote proceedings today.
12       ATTORNEY HIGGINS:  Yes.  On behalf of
13   plaintiff, Nannette Basa, we stipulate.
14       THE CERTIFIED COURT REPORTER:  And for
15   defendant?
16       ATTORNEY KAZARYAN:  Yes.  On behalf of
17   defendant, Brand Shared Services, we stipulate.
18
19       EXAMINATION
20   BY ATTORNEY HIGGINS:
21   Q   (By Attorney Higgins)  Ms. Riapos, how do you
22   pronounce your last name?
23   A   Riapos.
24   Q   Ms. Riapos.  Okay.  Thank you for that.
25       My name is Alex Higgins.  I represent Nannette
```

KAREN RIAPOS - 06/03/2022

---

**10**

1    Q    Do you have any understanding as to how they
2  would have searched your phone for text messages?
3    A    No, I don't.
4    Q    Okay.  And other than conversations you've had
5  with your attorney, what is the basis for your
6  understanding that IT may have searched your phone?
7    A    It was just more of an assumption.
8    Q    Okay.  So you don't have any specific memory of
9  your phone being searched?
10    A    No.  No, I don't.
11    Q    All right.  So I assume you've never given over
12  possession of your phone to anyone?
13    A    No, I haven't.
14    Q    And you haven't given your iCloud password to
15  anyone?
16    A    No.
17    Q    Okay.  All right.  Do you know whether you have
18  messages, for instance, text messages between you and
19  Nannette Basa on your phone?
20    A    I don't, no.  I don't know.
21    Q    And you've never looked personally for that?
22    A    I have not, no.
23    Q    All right.  Let's talk about your work history.
24          You've been working at BrandSafway -- excuse
25  me.  I sometimes will say Safway.  Is that okay?

---

**11**

1    A    That's fine.  Yes.
2    Q    You started at BrandSafway in December of 2019,
3  correct?
4    A    Yes.
5    Q    And you started as the director of talent
6  acquisition, right?
7    A    Yes.
8    Q    And what is that job?
9    A    I lead the talent acquisition for corporate
10  functions for North America, so all the recruiting for
11  our corporate and functional roles.
12    Q    Okay.  Do you have a job description?
13    A    I don't think we do, no.
14    Q    Okay.  Your work history is described in an
15  email from Rod Broschinsky back in December of 2019.  I
16  don't need to show it to you, but I'm going to read you
17  portions of it, if you see me looking down at a paper.
18    A    Okay.
19    Q    It says, "Karen has over 20 years of talent
20  acquisition HR management experience.  Most recently
21  Karen held a senior management position in talent
22  acquisition at Keurig Dr. Pepper."
23          Is that true?  Was that your previous job?
24    A    Yes, it was.  Yes.
25    Q    Okay.  And it says, "She also worked for XPO

---

**12**

1  Logistics, Inc., HD Supply, Inc., and Sun Trust Bank."
2          Are those all part of your work history?
3    A    Yes, they are.
4    Q    And were they all talent acquisition or
5  recruiting positions?
6    A    Yes, they were.
7    Q    Do you sometimes call talent acquisition
8  "recruiting?"
9    A    Yeah.  Yes.
10    Q    Okay.  And then it says you have a bachelor's
11  degree in communication studies from the University of
12  Rhode Island; is that true?
13    A    Yes.
14    Q    And what year did you obtain that?
15          I'm not interviewing you for a job, so I can --
16    A    Yeah.  No, no, no, I know.  I'm trying to
17  think.  1997, I believe, was when I finished.
18    Q    And he also writes about you that you have a
19  senior professional in human resources certificate from
20  the Human Resources Certification Institute.
21          I'm not sure if that's quite right, but could
22  you clarify what that is.
23    A    Yeah.  So it's a SPHR certification, which has
24  since expired.
25    Q    Oh, when did you obtain it?

---

**13**

1    A    Back in mid-2000's, I think.  I don't remember.
2    Q    Sometime after the year 2000?
3    A    Yes.
4    Q    Okay.  And why does it expire?
5          Do you have to do continuing credits or
6  something?
7    A    Yes, you have to do continuing credits.
8    Q    And why did you stop doing continuing credits?
9    A    I just got very busy with work and life, so.
10    Q    Okay.  And in terms of getting the SPHR
11  certification, you have to take a series of courses,
12  correct?
13    A    That's correct.
14    Q    And do any of your courses touch on employment
15  discrimination?
16    A    Yes, they did.
17    Q    All right.  And how many hours do you think you
18  spent learning about employment discrimination?
19    A    I don't remember.
20    Q    Was it more than five?
21    A    I don't remember.
22    Q    Okay.  Did any of your courses touch on
23  documenting employment decisions, how to document, why to
24  document, those kinds of things?
25    A    Yes.

---

KAREN RIAPOS – 06/03/2022

14

1    Q    And what did you generally learn about
2  documentation of employment decisions through your
3  courses?
4    A    That you should document.  I try to follow up,
5  you know, after conversations with emails or, you know --
6  yeah, I mean, just general documentation.
7    Q    Okay.  What about a hiring decision, keeping
8  notes of the interviews and why you selected somebody?
9        Did you learn anything about that in your
10  courses?
11    A    Not so much in the courses, but just over my
12  career, yes.
13    Q    And do you think that's important to create
14  documentation of a hiring decision?
15    A    Yes.
16    Q    Why?
17    A    So you can go back years later and review that.
18    Q    And why might you need to review that?
19    A    For a situation like this.
20    Q    Okay.  I understand.  All right.
21        So when you joined BrandSafway, Nannette Basa
22  was already working there, correct?
23    A    Yes.
24    Q    And she was a recruiting manager; is that
25  correct?

15

1    A    Yes.
2    Q    Do you know if she had a job description?
3    A    I don't remember.  I don't believe so, but I
4  don't remember.
5    Q    Did you review her personnel file?
6    A    No.
7    Q    You became her direct manager, correct?
8    A    I did, yes.
9    Q    Did you discuss her performance with Rod
10  Broschinsky when you came on?
11    A    Rod -- he just gave me background of the team,
12  so, yeah, like what their -- what their responsibilities
13  were.
14    Q    Did he comment at all about her performance one
15  way or the other?
16    A    Yeah, I mean, he said there were things that
17  she did well and things she needed to improve on.  Just
18  general comments.
19    Q    Were there other people he sort of debriefed
20  you on besides Nannette?
21    A    Yeah.  We had another person on our team -- and
22  I cannot remember her name at the time -- but she was a
23  contract recruiter.
24    Q    Was her name Mary Ann Goulding?
25    A    Yes.

16

1    Q    All right.  Did he say anything about her?
2    A    Yeah.  He let me know that we were probably
3  going to end her contract at the end of the year.
4    Q    Did he say why?
5    A    He just didn't think she was a good fit for the
6  organization.
7    Q    What did he say about Nannette in terms of what
8  she did well, for example?
9        Let's start with that, what she did well.
10    A    He said she, you know, had good experience with
11  recruiting and had gone ahead and implemented VNDLY,
12  which was our vendor management system.
13    Q    Okay.  Did he mention to you whether that had
14  resulted in cost savings?
15    A    I believe so, yes.
16    Q    Did he mention how much it had resulted in cost
17  savings?
18    A    No, I don't remember.
19    Q    Okay.  And what did he say that she needed to
20  improve on?
21    A    It was also around VNDLY and the
22  implementation.  There had been some feedback that it
23  hadn't been implemented the most efficient way.
24    Q    So did you ask somebody else to take over
25  implementation of VNDLY?

17

1    A    No, we decided that we would do a
2  reimplementation.
3    Q    And who was in charge of that reimplementation?
4    A    Nannette was.
5    Q    And how did that go, overall?
6    A    Overall, not great.
7    Q    Okay.  And what do you mean by "not great"?
8    A    Well, the processes were all very manual.  And
9  we really wanted to reimplement with more automated
10  processes within the system.
11    Q    And was that something that you think Nannette
12  should have done better?
13    A    Yes.
14    Q    Did you tell her that?
15    A    Yes.
16    Q    When did you first tell her that?
17    A    I think when we first started looking at
18  reimplementing, so maybe the beginning of 2020.
19    Q    Did you give her any written feedback or
20  direction on that?
21    A    I don't remember.
22    Q    Did you give her any written performance
23  evaluations or reviews?
24    A    I did not, no.
25    Q    Do you remember what she said when you told her

Exhibit 6

MICHELLE ROMAN - 09/07/2022

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE WESTERN DISTRICT OF WASHINGTON

 3                         AT SEATTLE

 4

 5   NANNETTE BASA,                    )
                                       )
 6                    Plaintiff,       )
                                       )
 7   vs.                               ) No. 2:21-cv-00754-MLP
                                       )
 8   BRAND SHARED SERVICES, LLC,       )
                                       )
 9                    Defendant.       )
     _____)
10

11

12

13

14        ORAL VIDEO DEPOSITION OF MICHELLE ROMAN

15            WEDNESDAY, SEPTEMBER 7, 2022

16

17

18

19            THE ORAL VIDEO DEPOSITION OF MICHELLE ROMAN,

20   produced as a witness at the instance of the Plaintiff,

21   was taken in the above-styled and -numbered cause on the

22   7th day of September, 2022, from 9:01 a.m. to 11:36 a.m.

23   Pacific Time.  The court reporter was Nor Monroe,

24   Certified Court Reporter for the State of Washington.

25   All participants appeared via Zoom videoconference.
```

---

**2**

```
1                    APPEARANCES
2
3   FOR PLAINTIFF
4         ALEX J. HIGGINS
          alex@alexjhiggins.com
5         LAW OFFICES OF ALEX J. HIGGINS
          2200 6th Avenue
6         Suite 500
          Seattle, Washington  98121-1844
7         Phone:  (206) 340-4856
8         CODY FENTON-ROBERTSON
          cody@beanlawgroup.com
9         BEAN LAW GROUP
          2200 6th Avenue
10        Suite 500
          Seattle, Washington  98121-1844
11        Phone:  (206) 522-0618
12
13  FOR DEFENDANT
14        HELEN MCFARLAND
          hmcfarland@seyfarth.com
15        EMMA KAZARYAN
          ekazaryan@seyfarth.com
16        SEYFARTH SHAW LLP
          999 3rd Avenue
17        Suite 4700
          Seattle, Washington  98104-4041
18        Phone:  (206) 946-4978
19
20
21  ALSO PRESENT:
22        (None)
23
24
25
```

---

**4**

```
1                    EXHIBITS
2                 (Newly marked)
3
4   NO.        DESCRIPTION                  PAGE
5   Exhibit 19 Email with Attachment --      45
               "Recruiting Process" -- 12/4/2019 --
6              BRAND002001 through 2003
7   Exhibit 20 Email Thread -- "RE: Accommodations  57
               Statement on job postings" --
8              BRAND003104 through 3113
9   Exhibit 21 Email Thread -- "RE: Supply Chain  61
               Travel Management Position" --
10             BRAND005097 through 5098
11  Exhibit 22 Email Thread -- "RE: Interviews-Supply  61
               Chain" -- BRAND005096
12
               Exhibit 23 Chat Printout -- BRAND000090  103
13
               Exhibit 24 Email from Michelle Roman -- "ACTION  64
14             NEEDED: HR Listening Sessions" --
               7/24/2020 -- BRAND004855
15
16
17
18
19             *     *     *     *     *     *     *
20
21
22
23
24
25
```

---

**3**

```
1                  I N D E X
2
3   WITNESS                                 PAGE
4   Title Page                                1
5   Appearances                               2
6   Index                                     3
7   MICHELLE ROMAN
8        EXAMINATION BY MR. HIGGINS            5
9        EXAMINATION BY MS. MCFARLAND        109
10  Deposition Concluded                    110
11  Court Reporter's Certificate            111
12  Changes and Signature                   112
13
14         *     *     *     *     *
15
16                  EXHIBITS
17     (Previously marked; not included with transcript)
18  NO.        DESCRIPTION                  PAGE
19  Exhibit 1  Defendant's Objections and Responses to  74
               Plaintiff's First Interrogatories and
20             Requests for Production
21  Exhibit 8  Email and Attachment --       28
               "Updated HR Org Charts" -- 8/14/20 --
22             BRAND004986 through 5003
23  Exhibit 9  Email Thread -- "Re: Thank you for  68
               session" -- BRAND001637 through 1639
24
25                 continued
```

---

**5**

```
1        (WEDNESDAY, SEPTEMBER 7, 2022)
2              (9:01 a.m.)
3        (Ms. Kazaryan not present.)
4              MICHELLE ROMAN,
5   having been called as a witness herein, having been
6   first duly sworn/affirmed, was examined and testified as
7   follows:
8              EXAMINATION
9   BY MR. HIGGINS:
10       Q.  Good morning, Miss Roman.  My name is Alex
11  Higgins.  I represent Nannette Basa in this case.
12           Would you state your name for the record?
13       A.  Michelle Roman.
14       Q.  Could you also state your home address?
15       A.  8019 Peaceful Circle, Sanford, Florida 32771.
16       Q.  Have you ever had your deposition taken
17  before?
18       A.  No.
19       Q.  Well, lemme explain to you a few things.
20  First of all, it's not an endurance test, and if you
21  need to use the bathroom, get up and stretch your legs,
22  go ahead and ask me, and that's fine, so long as you
23  finished answering.  So don't take my question and take
24  a break; but after you answer, say, "I'd like to take a
25  break."  Is that clear?
```

82

1        MS. MCFARLAND:  -- I was just gonna object to
2   the extent it calls for third-party prive-- it seeks
3   to evade third-party-privacy rights.
4        Q.  (BY MR. HIGGINS)  Yeah, you can -- you can
5   give me their initials.  I don't care really.  Just --
6   why don't you give me their initials for the record.
7        A.  C. R.
8        Q.  Okay.  So T. R. [sic] was in what job?
9        A.  Coordinator role.  HR coordinator role.
10       Q.  And how did you determine that T. R. should
11  be let go and --
12       (Simultaneous talking.)
13       A.  -- C. R.  S-- C as in Charles.
14       Q.  Oh, C. C. R.  Thank you.
15       -- C. R. should be let go and others should be
16  retained?  What did you -- what did you look at with
17  regard to that particular person?
18       A.  A scope of responsibility was the first thing;
19  what she was performing, the work that that person was
20  performing, compared to the other team members.
21       Q.  And -- and what was that scope?
22       A.  Coordinator work.
23       Q.  And that's . . . I assume fairly low on the --
24  the hierarchy?  I mean, I don't mean to offend
25  coordinators, but it's the -- it's the entry-level

83

1   position; correct?
2        A.  It's -- yeah, it's -- it's an enter-- yeah,
3   it's -- it's an entry-level HR role, correct.
4        Q.  And so her scope was pretty limited?
5        A.  The work being performed, yes, we -- I looked
6   at the work that was being performed and whether that
7   work could just be done by others on the team, and yes.
8        Q.  And were there other coordinators who you
9   retained?
10       A.  There was one other person with that title,
11  yes.
12       Q.  And did that person assume all of the
13  responsibilities of the other coordinator?
14       A.  Not all of 'em.
15       Q.  And what happened to the other
16  responsibilities for the -- for C. R.?
17       A.  They got disseminated across the team.
18  Everybody took a piece -- you know, some of the
19  responsibilities on.
20       Q.  Did you think about selecting somebody else
21  for layoff?  Was it -- you know, was there another
22  candidate in your mind?
23       A.  You're talking about my team?
24       Q.  Yeah, on your team did you think about -- was
25  it just so obvious that was the only person that ever

84

1   came to mind, or did you think, "Well, is it this person
2   or should I --"
3        (Simultaneous talking.)
4        A.  Well, I look at the work groups.  I look at
5   the work groups.  And so the coordinators were one work
6   group on my team.  And then I looked at, you know, who
7   else I had on my team, and they were all performing
8   different work.  And so I started with the work groups
9   and the work functions, and then I worked my way
10  through.
11       Q.  Mm-hmm.  And -- and as far as you recall, you
12  didn't take notes of that decision-making process?
13       A.  I don't recall.
14       Q.  Did you check in with anybody else about that
15  decision-making process to sort of do a reality check;
16  just sort of bounce off of someone else?
17       A.  I don't recall.
18       Q.  Who had to approve the -- the nay-- when you
19  submitted the name of the person you wanted to lay off,
20  who did you submit it to for approval?
21       A.  It would have been submitted to legal.
22       Q.  And which person in legal?
23       A.  Theresa McDaniel.
24       Q.  And did . . . did anyone else ultimately have
25  to sign off on it?

85

1        MS. MCFARLAND:  Objection [indiscernible]
2   calls for speculation.
3        Q.  (BY MR. HIGGINS)  Well, did anyone have to
4   approve the layoff decision, such as Meg Newman?
5        MS. MCFARLAND:  Objection:  Calls for
6   speculation.
7        Q.  (BY MR. HIGGINS)  Did you have to get Meg --
8        (Simultaneous talking.)
9        MS. MCFARLAND:  -- answer --
10       Q.  (BY MR. HIGGINS)  -- Newman's --
11       D-- no, no, don't answer.
12       Did you get Meg Newman's approval for the --
13  the layoff decision?
14       A.  Yes.
15       Q.  Did she ask you any questions about why you
16  picked that particular candidate?
17       A.  Yes, that would have been part of our ordinary
18  discussion on that type of a topic, yes.
19       Q.  Do you know -- do you remember if she asked
20  you any questions?
21       A.  She asked me, you know, to explain to her the
22  decision process I had used and why that individual had
23  been selected, yes.
24       Q.  And did -- did you tell her basically what you
25  told me here today?