# Exhibit 10

HONORABLE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| NANNETTE BASA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BRAND SHARED SERVICES, LLC, a Delaware corporation,<br><br>Defendant. | Case No. 2:21-cv-00754 MLP<br><br>DEFENDANT'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION |

Defendant Brand Shared Services, LLC ("Defendant") responds to Plaintiff Nannette Basa's ("Plaintiff") First Interrogatories and Requests for Production as follows:

**PRELIMINARY STATEMENT**

The information contained in each response is based only on the information currently available to Defendant. These responses are made solely for purposes of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court. All objections and grounds are expressly reserved and may be interposed at the time of trial.

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

for each of the HR work groups. Once leadership understood where they had opportunity to streamline work within each work group, they took a closer look at the roles and responsibilities for each incumbent in those roles and made a determination of which roles to eliminate.

**INTERROGATORY NO. 5:** Please identify all individuals who were involved in the decision to the hire or create positions for Ryan Wilson, Nicole Norris and "Wes P.", and describe each person's participation in detail.

**ANSWER:** Defendant objects to this interrogatory as vague and ambiguous and to the extent it assumes that positions were "created" for Ryan Wilson, Nicole, Norris, and "Wes P." (believed to be Wes Powell who is a contractor and not Defendant's employee).

Subject to and without waiving the foregoing objections, and assuming the interrogatory seeks the names of the person who hired Ryan Wilson, Nicole Norris, and "Wes P." (believed to be Wes Powell), Defendant answers as follows:

The decisions to hire Mr. Wilson and Ms. Norris were made by Director of Talent Acquisition Karen Riapos. Defendant did not hire "Wes P." (believed to be Wes Powell) as an employee; he was a contractor.

**INTERROGATORY NO. 6:** Please identify all individuals who were considered for the positions that were ultimately filled by Ryan Wilson, Nicole Norris and "Wes P.". For each individual identified, include their job title, name, age, and race/nationality.

**ANSWER:** Defendant objects to this interrogatory as vague and ambiguous with regard to the meaning of the phrase "were considered for the positions." Defendant also objects to this interrogatory as overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. In the ordinary course of business, Defendant does not store or maintain information related to applicants for a particular position. It would be extraordinarily difficult for Defendant to try to scour through its records to try to reconstruct the hiring process for the roles that Mr. Wilson and Ms. Norris were ultimately hired into.

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

In addition, Defendant objects to this interrogatory because it invades the privacy interests of individuals who are not parties to this lawsuit and who may not be even be employed by Defendant. Those individuals have legitimate privacy interests in their personal demographic (age, race/nationality) information; the fact that they applied for a job with Defendant; and the fact that they did not receive the job.

Subject to and without waiving the foregoing objections, Defendant answers as follows: Plaintiff Nannette Basa was approached with regard to the positions ultimately filled by Mr. Wilson and Ms. Norris, but she indicated she was not interested in recruiting, which is what these positions entail.

**SUPPLEMENTAL ANSWER:** Subject to and without waiving the foregoing objections, Defendant supplements as follows -- Plaintiff was the only other person considered for these positions.

**REQUESTS FOR PRODUCTION**

*All responsive documents may be produced either on paper or searchable .PDF.* Plaintiff reserves the right to request documents in native electronic format as may be requested in a later date. All spreadsheets and WORD documents should be produced electronically in their native format.

**REQUEST FOR PRODUCTION NO. 1:** Please produce copies of all documents relating to Plaintiff contained in any file maintained by Defendant, however named and wherever maintained, including but not limited to the Plaintiff's employee files, personnel files, medical files, etc.

**RESPONSE:** Defendant objects to this request for production to the extent it seeks attorney client privileged material and attorney work product. Defendant further objects to this request as vague and ambiguous, overbroad, and unduly burdensome. Subject to and without waiving the foregoing objections, Defendant will produce Plaintiff's personnel records, medical records, and pay records.

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

DATED: January 14, 2022.

SEYFARTH SHAW LLP

By: */s/Emma Kazaryan*

Helen M. McFarland, WSBA No. 51012
Emma Kazaryan, WSBA No. 49885
999 3rd Avenue, Ste. 4700
Seattle, WA 98104
P: (206) 946-9423
F: (206) 299-9974
hmcfarland@seyfarth.com
ekazaryan@seyfarth.com

*Attorneys for Defendant Brand Shared Services, LLC*

DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION - 12
(CAUSE NO. 2:21-CV-00754 MLP)

78770822v.1

SEYFARTH SHAW LLP
Attorneys at Law
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

# Exhibit 11

Magistrate Judge Michelle L. Peterson

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON AT SEATTLE**

| | |
|---|---|
| **NANNETTE BASA,**<br>Plaintiff,<br>vs.<br>**BRAND SHARED SERVICES, LLC,**<br>Defendant. | **Case No. 2:21-cv-00754-MLP**<br><br>**PLAINTIFF'S THIRD INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS *AND DEFENDANT'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES THERETO*** |

Defendant Brand Shared Services, LLC ("Defendant") responds to Plaintiff Nannette Basa's ("Plaintiff") Third Set of Interrogatories and Requests for Production as follows:

## PRELIMINARY STATEMENT

The information contained in each response is based only on the information currently available to Defendant. These responses are made solely for purposes of this action. Each response is subject to all objections as to competence, relevance, materiality, propriety, and admissibility, and all other objections and grounds which would require the exclusion of any statements contained herein, if such statements were made by a witness present and testifying at court. All objections and grounds are expressly reserved and may be interposed at the time of trial.

The fact that Defendant has responded to all, or part, of any interrogatory is not intended to be, and shall not be construed to be, a waiver of all, or any part, of any objection to any

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

requests are overly broad and burdensome in that they request information and documents that are neither relevant nor reasonably calculated to lead to the discovery of relevant information. Requests should not require information regarding, for example, persons not parties to this lawsuit, departments where Plaintiff has not worked, persons and places company-wide and timeframes outside the relevant statute of limitations and/or Plaintiff's period of employment.

(d) Privilege and Trial Preparation Materials. Regardless of whether its response to a given request contains a specific objection, Defendant objects to all discovery requests to the extent that they call for information or documents that fall within any relevant privilege (including without limitation the attorney-client privilege and the joint defense privilege), that fall within the work product doctrine, that constitute trial preparation materials within the meaning of CR 26, or that constitute expert witness information that is not discoverable under CR 26.

(e) No Waiver. Nothing set forth in Defendant's specific objections or responses is intended, or should be construed, as a waiver of these General Objections.

(f) Supplementation of Responses. Discovery is ongoing and, pursuant to CR 26(e), Defendant will supplement each response as required.

(g) Plain Meaning. Defendant objects to Plaintiff's definitions to the extent they differ from the plain meaning of any particular term.

(h) Discovery is Ongoing. Investigation is continuing. Defendant reserves the right to provide information or documents that may come to its attention and become available in the future and to use such information or documents at any hearing or proceeding related to this action.

## INTERROGATORIES

**INTERROGATORY NO. 8:** Please identify all performance issues or deficiencies with Plaintiff's performance that arose between September 23, 2020, and November 30, 2020, or that were brought to the attention of Karen Riapos during that same time frame, and which influenced her decision to end Plaintiff's employment and not to offer her any continued employment or contract work.

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

**ANSWER:**  Defendant objects to this interrogatory as vague and ambiguous, overbroad, unduly burdensome, argumentative, and cumulative.  Defendant further objects to this interrogatory as argumentative and misrepresenting Ms. Riapos' prior testimony to the extent it assumes Ms. Riapos decided to end Plaintiff's employment, decided not to offer her continued employment or contract work, or that Plaintiff's specific performance issues between September 23, 2020 and November 30, 2020 were a sole factor in the decision to lay off Plaintiff.

Subject to and without waiving the foregoing objections, Defendant answers as follows: Please see documents produced in the course of discovery and transcript of Ms. Riapos's deposition.  Defendant has provided evidence regarding Plaintiff's performance problems both before September 23, 2020 and through her employment, and those performance issues and deficiencies (to the extent Ms. Riapos was aware of them) influenced Ms. Riapos's decision to identify Plaintiff as a possible person for layoff.  However, as referenced in other discovery, Plaintiff's performance problems were not the sole reason Defendant laid her off.

**SECOND SUPPLEMENTAL ANSWER:** Subject to and without waiving the objections in its original answer to this interrogatory, Defendant supplements its answer as follows:

During her deposition, Ms. Riapos testified at length about the performance issues that informed her decision to identify Ms. Basa for layoff (for example, please see her deposition transcript at 35:18-39:20).  In addition, in the course of discovery, Defendant has produced numerous emails that pertain to the issues Ms. Riapos discussed during her deposition.  Also, in the answer to the very next interrogatory in this set (Interrogatory No. 9), Defendant provided a detailed, itemized list of specific performance issues that were called to Ms. Riapos's attention and that she testified informed her decision to identify Ms. Basa for layoff.

In addition to the evidence and documents cited, Defendant identifies the following performance issues or deficiencies that influenced the decision to terminate Plaintiff's employment:

PLAINTIFF'S THIRD INTERROGATORIES AND
REQUESTS FOR PRODUCTION ***AND
DEFENDANT'S SECOND SUPPLEMENTAL
OBJECTIONS AND RESPONSES THERETO*** - 4

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

- Late payments that took a long time to resolve – these issues are well-documented in the documents Defendant produced in the course of discovery. In addition, , please see bullet point nos. 4 and 5 below.

- Lack of work product (including, without limitation, missing deadlines) – While Ms. Riapos did not keep a detailed log of every single issue with Plaintiff's work product, as Ms. Riapos discussed during her deposition, and as evidenced in the emails Defendant has produced in the course of discovery, there were issues with Plaintiff's work product and output, including late payments to vendors and lack of urgency to get issues resolved.  For example, as set forth in greater detail below (bullet point no. 4 in this list), there was at least one late payment issue that took several months to get resolved, and even then, the resolution only came after the third-party partner escalated the issue to Defendant's chief information officer.  Notably, even after the issue was escalated, Plaintiff continued to demonstrate a lack of urgency in getting it resolved: as detailed in bullet point no. 5 below, another employee that followed up on the issue reported that Plaintiff was "not helpful" in getting the issue resolved and that Plaintiff kept telling her "not to worry about it."

  By way of further example, and as set forth in greater detail below (bullet point nos. 6 and 7), Ms. Riapos received complaints from managers that Plaintiff failed to help them with things they referred to her for.

  In addition, as Ms. Riapos testified about at her deposition, and as demonstrated by emails produced by Defendant (including BRAND 004529-004533) there were instances where Plaintiff failed to provide timely reports or responses to requests for information, and Ms. Riapos and Rod Broschinsky had to follow up with her multiple times.

- Combative communications – Ms. Riapos observed and was made aware of numerous instances of Plaintiff being combative or curt in her professional communications.  While Ms. Riapos did not keep a detailed log of every such communication, in the emails Defendant has produced in the course of discovery, there are numerous examples of Plaintiff engaging with her coworkers and third-party partners in a combative or curt manner.  For example, please see BRAND 004720- 004723 and BRAND 004529-004533.  By way of further example, see the incidents described in bullet point nos. 4 and 5 below and the related emails (which have been produced in discovery).  Notably, in one of those emails, a third-party partner wrote about Plaintiff:

  > Earlier this week I sent Nannette a notice of termination of our contract…I have asked her about five times to tell me when we will get paid; and what I get is what you saw – belligerence, misdirected spunk, indifference and sheer arrogance.

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA  98104-4041
(206) 946-4910

- In March 2020, after one of Defendant's third-party partners escalated a non-payment issue to Defendant's chief information officer Jay Fisher, who reported it to Ms. Riapos. He revealed that when a contractor inquired about a payment he had not received, Plaintiff sent a curt and dismissive email response;

- While trying to resolve non-payment issue, Heather Morrison, Defendant's Director of IT and Finance, had trouble getting help from Plaintiff. Ms. Morrison emailed Mr. Fisher stating, "Just for your information—Nannette was not helpful in the last email I sent—she kept telling me not to worry about it…"

- In approximately April 2020, Ms. Riapos received a complaint from Jerry Dolly that Plaintiff failed to help fill a role that he requested help with back in January 2020. Due to Plaintiff's failure, Ms. Riapos had to step in to help fill the role.

- In June 2020, Mike Krach (a branch manager) complained to HR about persistent issues working with Plaintiff. He wrote:

> My experience with Nannette has been nothing but failure, Over the past 3 years every time she has been involved with an employee placement/search for my region has come up with nothing. I do not recall my region hiring anyone that she has referred to my region (I might be wrong but that is to the best of my memory).

Separately, Mr. Krach also advised Ms. Riapos that Ms. Basa was combative with local vendors that he wanted to work with.

**INTERROGATORY NO. 9:** Please identify all negative or critical feedback received by Karen Riapos regarding Plaintiff, including but not limited to feedback from Mike Krach, Jerry Dolly, and Jay Fisher, from December 1, 2019, to November 30, 2020.

**ANSWER:**

Defendant objects to this interrogatory as vague and ambiguous regarding "critical feedback," overbroad, unduly burdensome, and cumulative. Defendant further objects to this interrogatory as not reasonable calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the foregoing objections, Defendant answers as follows: Please see documents produced in the course of discovery which contain several examples of complaints by managers regarding Plaintiff's performance. Ms. Riapos directly received at least four complaints from different managers about Plaintiff's work performance and brusque

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

**VERIFICATION**

I, Karen Riapos, being first duly sworn upon oath depose and state as follows: that I am designated to speak for the defendant herein, that I have read the above interrogatories and prepared the answers thereto, and that to the best of my knowledge the answers provided are true and correct.

Date: 10/3/22

Karen Riapos
Karen Riapos

**ATTORNEY VERIFICATION**

I, the attorney of record for the Defendant, hereby certify that the objections and responses are made in compliance with FRCP 26(g).

DATED: this 3rd day of October, 2022

*s/Emma Kazaryan*
Attorney for Defendant

PLAINTIFF'S THIRD INTERROGATORIES AND REQUESTS FOR PRODUCTION ***AND DEFENDANT'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES THERETO*** - 9

SEYFARTH SHAW LLP
999 Third Avenue
Suite 4700
Seattle, WA 98104-4041
(206) 946-4910

# Exhibit 12

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

---

NANNETTE BASA, )
)
Plaintiff, )
)
vs. )No.2:21-CV-00754-MLP
)
BRAND SHARED SERVICES, LLC, )
)
Defendant. )
)

---

REMOTE VIDEOCONFERENCE DEPOSITION UPON ORAL EXAMINATION

OF

RODNEY BROSCHINSKY

---

Taken via Zoom at: Denver, Colorado

DATE TAKEN: September 13, 2022

REPORTED BY: ELIZABETH PATTERSON HARVEY, RPR, CCR 2731

A P P E A R A N C E S:

FOR THE PLAINTIFF:

Alexander J. Higgins
alex@alexjhiggins.com
Law Offices of Alex J. Higgins
2200 Sixth Avenue Ste 500
Seattle, Washington 98121
206.340.4856

Cody Fenton-Robertson
cody@beanlawgroup.com
Bean Law Group
2200 Sixth Avenue, Suite 600
Seattle, Washington 98121
206.522.0618

FOR THE DEFENDANT:

Helen M. McFarland
hmcfarland@seyfarth.com
Seyfarth
999 Third Avenue
Suite 4700
Seattle, Washington 98104
206.946.4910

* * * * * * * *

I N D E X

DEPOSITION OF RODNEY BROSCHINSKY

EXAMINATION INDEX

| EXAMINATION BY: | PAGE |
|---|---|
| ATTORNEY HIGGINS | 4:19 |

EXHIBIT INDEX

| EXHIBITS FOR IDENTIFICATION | | PAGE |
|---|---|---|
| Exhibit 31 | Text Messages (BASA 00834-869) | 14:8 |
| Exhibit 6 | Undated email with attachment (BRAND0003612-615) | 32:12 |
| Exhibit 32 | March 8, 2019 email (BRAND055800) | 45:18 |
| Exhibit 30 | May 21-27, 2020 email chain (BRAND004349-351) | 72:17 |
| Exhibit 29 | June 19, 2020 email chain (BRAND004681) | 76:3 |
| Exhibit 16 | June 24, 2020 email chain (BRAND0004720-704) | 78:15 |

Denver, Colorado September 13, 2022
9:00 a.m.
-o0o-

(Request by the Washington Certified Court Reporter for stipulation by counsel to the validity of the remote administration of the oath and the remote proceedings.)

ATTORNEY HIGGINS: Yes, we do.

ATTORNEY MCFARLAND: And we do as well for defendant.

RODNEY BROSCHINSKY, witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY ATTORNEY HIGGINS:

**Q Good morning, Mr. Broschinsky. My name is Alex Higgins. I'm one of the attorneys for Nannette Basa.**

**Could you state and spell your name and address for the record.**

A Sure. Do you want my work address?

**Q Your home address, please.**

A So it's Rodney Broschinsky. And it's -- do you want me to -- R-O-D-N-E-Y. Last name is spelled B-R-O-S-C-H-I-N-S-K-Y. And my home address is 17688 West 95th Street, in Arvada, Colorado 80007. Correction. It's Avenue.

**Q Thank you. Have you ever had your deposition taken before?**

A I have, yes. It's been a long time, but yes.

**Q How many times before?**

A Four or five times, possibly.

**Q And were they in your capacity as an HR manager?**

A Correct.

**Q And have you been an HR manager at -- anywhere other than Frontline Safety, your current job, or at BrandSafway, your previous job?**

A Yes, I have.

**Q Where were you an HR manager before?**

A I was at Cottage Health Systems in Santa Barbara, the County of Ventura, Bean Dredging in New Orleans, and for a short while a company called Pink Dot in California, in central coast of California.

**Q And how many years total experience do you have in HR?**

**profile. And just to let you know, I'm not stalking you. I just thought it would make it easier for me to find that out online. All right?**

**So why did you leave Brand in October 2021?**

A My position was eliminated.

**Q And what happened to the job duties you were performing? Who assumed those?**

A They were sent overseas. I was the vice president of the international division so -- for all, you know, human capital, human resources items for our international division. And there was a decision to move that role overseas.

So it was actually, to my knowledge, split up and given to a couple of people, but primarily to the HR leader in Poland. And to my knowledge, they haven't replaced my position. Maybe they have since then, but they hadn't the last time I checked.

**Q Were you offered a severance?**

A Yes, I was.

**Q Did you sign an agreement with Brand as part of that severance?**

A Yes.

**Q Did that severance agreement provide any conditions for you to cooperate with Brand in litigation in the future or anything to that effect?**

A Not to my knowledge.

**Q All right. And are you still receiving any payments from Brand pursuant to that severance agreement?**

A No.

**Q Did it contain what's called a non-disparagement clause, where you agreed not to say anything bad about Brand or its managers, employees, et cetera?**

A Yes.

**Q And do you --**

ATTORNEY MCFARLAND: So let me just object. I mean, I don't know. I haven't actually reviewed the separation or severance agreement. I don't know whether it's confidential or not.

But this line of questioning, I'm not sure, Mr. Broschinsky, if you know whether it was intended to be confidential or not, and whether this is something you have any concerns about testifying about.

THE WITNESS: My opinion is that yes, there are elements of the separation agreement that I'm not supposed to talk about. The non-disparagement piece is really not necessarily what it refers to. My only thing is I don't understand why this would have anything to do with where the case is going, so yeah.

**Q (By Attorney Higgins) Maybe my next question**

**will help illuminate that.**

**My next question is whether you believe the non-disparagement clause applies to your testimony today?**

A It's been a while since I've read the clause. I don't believe so. If I'm answering questions that are specific to the case at hand and I'm being honest, I don't believe it would be in conflict. But I would need to defer to my counsel to be specific about that.

**Q All right. I have another area of inquiry, and that is about your work cell phone at Brand.**

**My understanding is that most people were issued work cell phones at Brand.**

**Is that true with you?**

A Yes.

**Q And do you remember was it like the last ten years of your employment you had a work cell phone, something like that?**

A The entire -- almost the entire time that I was employed, I had a work phone.

**Q And did you use it to send and receive text messages to other employees of Brand?**

A Yes.

**Q Did you text with Nannette Basa?**

A I don't recall.

**Q All right. Did you ever search your phone for**

**text messages with Nannette Basa or about Nannette Basa?**

A No, I did not.

**Q Did you ever give your phone over to a third party to look at for information about Nannette or her case?**

A Nope.

**Q Were you ever told not to delete information on your phone concerning Nannette?**

A No. But just to be clear, I had a work phone that was turned in when I left the company about a year ago. And at that point, no, I had not been involved in the case.

**Q Who did you turn your phone in to?**

A Human resources.

**Q Was there a particular individual who received it?**

A It's been a year, so I can't say specifically, no.

**Q All right. I'm going to show you what's been marked as -- actually, I'm going to share in the chat so you can pull it up if that's all right. It's a document.**

**Hold on. I'll see if I can manage this.**

**I'm going to mark this as Exhibit 31. We're going to mark these a little out of order today, so I apologize for that.**

**Ms. Riapos testified -- let's see.**
**I asked her whether she looked at whether Nannette was being paid too little.**
**And she said, "I didn't because Rod Broschinsky had said he was going to deliver her performance review, and within that would be a merit increase, so he really had access to all of that."**
**Then I asked her, "So that was after you started?"**
**"Yes."**
**"And it was shortly after you started, so you got the impression that it was for the year 2019?"**
**"Yes, okay. It wasn't until April when they rolled out the merit," so -- and then she says she didn't have any conversations with you about that exactly.**
**My question -- that's just a long-winded way to kind of tee up the question, which is, do you remember giving Nannette a merit increase for her work in the year 2019?**
A So if I'm understanding -- let me just make sure. I need to ask a question back before I answer.
So fall of 2019, the question is did we give Nannette a merit adjustment in the fall of 2019 for performance during 2018?
**Q No. Sorry. I'm glad you clarified.**

**The question is whether after 2019 was over --**
A Okay.
**Q And perhaps I've mixed up the years. But tell me if you think I'm on the right track. Maybe you're right.**
**But my understanding is that Karen didn't look at Nannette's salary when she started because you were going to do that as part of your annual review process of Nannette that you were going to keep ownership of because you had been her manager for more of the year than Ms. Riapos.**
A Yeah. I think I understand what you're saying.
So the way the merit cycle works is that if all goes well, typically, in the first part of the current year, you review performance for the prior year. And based on that performance, the person may or may not be eligible for a merit adjustment.
And if a person had a change in leadership, the person who was the -- you know, owned the majority of the time of that leadership had significant or some input in, you know, the discussion about how that person scored on their performance eval.
So if it's a shared year, the two leaders would get together and discuss, you know, what their experience is with that employee in terms of their performance and

their need for development and move forward from there.
So it sounds like the conversation, if the dates are kept consistent, that's likely what had occurred. So Karen probably responded, I'm guessing, in that I was the supervisor for Nannette for a period of time and would have had input.
But I don't recall the conversation. I'm sure that that's the scenario, though.
**Q So is it your understanding that what should have happened and what normally happens is the two managers who share a year of management over an employee would get together and talk about it when the time for awarding merit increases comes around?**
A That is -- that's what we like to have happen because it would be fair to share that, you know, the experience.
**Q But you don't remember doing that with Karen Riapos in early 2020?**
A No, sir.
**Q And do you remember whether you gave Nannette any kind of merit increase for her performance in 2019?**
A I don't recall specifically. I wouldn't be surprised if we did, but I don't recall if we did.
**Q Do you recall anything about her performance in 2019, as you sit here today?**

A You'd have to be more specific with the question. I mean, as a leader, you engage with your employee quite often, so I don't know the answer to that.
**Q Well, do you believe that her performance in 2019 warranted a pay increase?**
A I don't recall. I can't say I recall a reason why it wouldn't, but I -- there's no significant event in my mind that would say one way or the other, other than I know she was a hard worker.
**Q Okay. It's been about an hour. And I generally like to take breaks after an hour and sort of refocus what I've accomplished, what I need to accomplish next, and give people a break, have coffee, whatever. So how about we meet back -- and I'm going to be done probably by noon today, just because you're not a wealth of -- let's go off the record.**
(Recess.)
(Exhibit Number 32 marked.)
**Q (By Attorney Higgins) So I've marked what is Exhibit 32 that I've shared in the chat.**
**Let me know when you have it up in front of you.**
A I have it.
**Q Okay. This is an email from Jamie Hay to you about Nannette; is that correct?**

A Correct.
**Q And this would be in March of 2019, before Karen Riapos was hired; is that correct?**
A I don't recall when Karen was actually hired, but likely since it came from Jamie, so yeah.
**Q Okay. And it's about a bonus that Nannette received; is that correct?**
A That appears to be correct, yes.
**Q Do you remember the amount of the bonus?**
A I don't remember the amount. I believe it was around -- yeah, I don't remember the exact amount, but I do remember the event itself.
**Q What do you mean by "the event"?**
A Well, the event, meaning she was awarded a bonus.
**Q And do you know why she was awarded a bonus?**
A Performance.
**Q What performance?**
A Specifically, if I recall, it was her involvement in the contingent labor project that was underway.
**Q Also known as VNDLY?**
A You know, to be clear, VNDLY was a component of contingent labor. So contingent labor was a more broad topic. VNDLY came into play to help that effort

contingently, but it was a project that we had begun prior to VNDLY.
**Q And what was she doing exactly at the time that led to the bonus?**
A She was a recruiter, but she was recruiting open positions. That was part of her job. And with regard to contingent labor, it was to look at our process. Contingent labor means temporary labor, and it's a big expense. So it was to look at the costs associated with it since it was, you know, part of that process.
**Q And how would she address the costs?**
**I mean, she had to do more than just look at it, right?**
**She had to do something about it, I assume.**
A So there are a lot of contracts when it came to contingent labor, so it was matter of, you know, summarizing that data and then understanding which contracts existed and how much the markup was on those contracts.
**Q And then would she go about negotiating a better, more favorable markup with the providers or the vendors?**
A I don't recall if she was the driving force of negotiating contracts.

**Q Do you know who was?**
A It would be either the operations leader at the branch -- because remember we had, you know, hundreds of branches throughout the United States. And typically the person who's in charge of the P&L is a big part of that process because they're securing that work locally.
But we wanted to be involved to try to mitigate overpayments.
**Q Right. And that was her job, to figure out where overpayments were being made out at the various sites and help them find better arrangements with vendors at a lower cost?**
A Her job was to recruit for open positions and fulfill vacancies and work on the contingent labor project, which was to identify -- help provide some boundaries with regard to how much we were paying for contingent labor.
**Q And if she saw that too much was being paid for contingent labor, she would suggest steps to be taken to reduce the costs?**
A Correct.
**Q And was she successful in that regard?**
A In some cases, yes.
In other cases -- you know, I can't say specifically. It was a very broad, large project.

**Q Well, do you know why she was awarded a spot bonus for her work on the VNDLY --**
A Because we did -- yeah, we captured some success there. And due to the collective efforts, she was awarded a bonus for that.
**Q Were other people besides Nannette given a bonus for work on the contingent labor project?**
A I don't recall.
**Q And who's Gabe?**
A Gabe is the -- I think he's in a different position today. But Gabe was the -- I don't recall what position he was in specifically, but he was an operations leader.
**Q Was he a vice president?**
A He was when I worked for him. I don't recall if his title was vice president during this time frame.
**Q Was he elevated to COO at some point?**
A I don't believe there is a COO in Brand.
**Q Do you remember what other titles Gabe held?**
A I can say this: He was always in an operations capacity.
**Q And who's Bill --**
A Sorry. Let me back up. I apologize. That's not entirely true.
Before he was in an operations capacity, he was

a supply chain leader.
**Q And you don't remember which capacity he was serving in at this time?**
A I don't.
**Q And there's a Bill referenced in the email. Who's Bill?**
A I don't know for sure. I couldn't tell you for sure.
Can we go back? Let me go back to it.
**Q Yeah. There's a Bill referenced. She said she was shocked to get the email from Bill and Gabe.**
A I don't -- I don't recall who Bill is. I mean, I know our CEO at the time was Bill Hayes.
**Q Okay. And do you recall doing performance evaluations for Nannette?**
A I believe I only did one. Since she didn't report to me for too long, I believe I did one performance evaluation for her.
**Q Do you recall anything about the feedback you gave her in that evaluation?**
A I gave her favorable feedback to keep her motivated and direct her in the right trajectory to keep continuing to do her job.
**Q Just in terms of the feedback, you remember giving her favorable feedback, correct?**

A I don't -- I don't recall giving her a negative score on her evaluation, other than we may have talked about some of our communication pattern.
**Q Okay. So overall, your recollection is the one performance evaluation you gave her was generally favorable?**
A Correct.
**Q You think that you might have had some constructive criticism about communications; is that your recollection?**
A Yes, sir.
**Q And what was the feedback about communications that you gave to Nannette?**
A We sometimes had strained communication with regard to her accepting, you know, information that I'm giving her.
**Q And how did she receive that constructive criticism when you gave it to her?**
A I mean, she listened, but not often did she always agree with me. But we worked through it, just as any type of supervisor-subordinate. Sometimes it took a while to get through it.
**Q Did you like working with her?**
A That's a very -- we had a supervisor-subordinate relationship. So as far as the

word "like," I don't know how to respond to that.
**Q Well, did you enjoy being her boss?**
A I enjoy my job. So I can't say that there's a reason to say no, you know. I mean, I'm a HR leader, so I enjoy my job.
**Q Were you involved in the hiring of either Nicole Norris or Ryan Wilson as recruiters for Brand?**
A Can you define "involved"?
**Q Well, let's break it down.**
**Were you aware that Nicole Norris and Ryan Wilson were being hired by Brand?**
A Yes.
**Q Were you aware before they were hired?**
A Ryan, yes.
I can't say for sure on Nicole's part.
**Q Why do you say yes to Ryan?**
**What do you remember about knowing about his candidacy or his position before he was hired?**
A I had lunch, and Karen and I talked about it. I had lunch with Ryan and Karen.
**Q Do you know why you were invited to that lunch?**
A It was at a time when I was still very close proximity to Karen's job, worked down the hallway, had lots of historical knowledge of Brand. And so I was invited to the discussion.

**Q Did you have an impression of Ryan after that lunch?**
A I felt like his requisite knowledge, skills and abilities were sufficient to do the job successfully.
**Q Did you tell Karen that?**
A Yes.
**Q Did she ask you any other questions?**
A Not that I recall.
**Q And you don't recall meeting Nicole Norris before she was hired; is that correct?**
A I don't believe I was involved in her interview process. Not that I recall.
**Q Do you know whether either Nicole or Ryan's position was advertised before it was filled?**
A I don't recall.
**Q Did you have a discussion with Karen about why she picked either Ryan or Nicole for those jobs?**
A No, I did not have that conversation.
**Q Do you know whether Karen talked to Nannette Basa about whether she wanted to fill either of those roles?**
A I don't know.
**Q She never told you that?**
A Not that I recall.
**Q Would it surprise you, one way or the other --**

**Q So you understand that Excel allows you to have two separate tabs, correct, which would -- that has different data on each tab?**
A Yes, I'm clear with that.
**Q Right. And so is it possible she's saying that she's going to create one Excel spreadsheet, but it's going to have two tabs with all of the information you want on two separate tabs?**
ATTORNEY MCFARLAND: Objection. Calls for speculation.
**Q (By Attorney Higgins) Well, let me rephrase the question.**
**You wrote to her in your email, after she said it's going to be one report with a separate tab, you wrote, "It can be a separate tab, but it has to indicate clearly all the vendors that we've renegotiated rates with, listing the before-and-after data."**
**Did I read that correctly?**
A You did.
**Q So was it okay with you if it was one Excel spreadsheet with two tabs with the information on two separate tabs?**
A My concern was making sure that the data presented was adequate for what we were trying to do.
**Q And you have no recollection, as you sit here**

**today, that she provided you data that was not adequate?**
A I don't recall the outcome of that.
**Q Okay. Did you ever indicate to anybody that you were unhappy with her performance on that issue?**
**Other than the email we just read, where it's like, could be the way she communicates, did you ever have communications offline here about that you were unhappy with Nannette or thought her performance was bad or anything?**
A Specific to this, this email thread?
**Q Yes.**
A Not -- I don't recall an offline conversation specific to this email thread that I was upset about.
**Q Do you recall having any conversations about your dissatisfaction with Nannette's performance --**
A Yes.
**Q -- at any time after Karen became her manager?**
A Yes.
**Q Okay. Tell me all -- everything you can remember about that.**
A On occasion -- and I mentioned this earlier in the deposition -- on occasion, our communication would get very strained. And don't know why, but it seemed that on occasion, our communication just did not work well and it got frustrating. And I did occasionally have

conversations about that.
**Q Can you think of an example of where it got strained?**
A You know, I don't know a specific example. Yes. I can cite a specific example.
**Q Okay.**
A I had, at one point, asked for a recruiting report -- a recruitment report. Recall that her job wasn't just to do the contingent labor program. Her job was a recruiter. And on occasion, we needed to do a status check of what's going on with regards to open recruitment.
The company is a people company. We get paid for doing work and that work is done by people. So if we're not continuously recruiting, we're not doing our job as a recruiter.
I had asked her -- I don't recall the exact timeline on this, but I had asked for a recruitment report. And it was very difficult to get that report done. I don't think she wanted to do it. At least that was my opinion.
**Q And did you share your frustration with anyone?**
A I don't recall having a specific conversation, but I do recall being frustrated with the conversation.
**Q So you don't recall reporting that to Karen**

**Riapos?**
A Not specifically, no.
**Q Do you recall reporting that frustration to anyone?**
A I mean, it could have happened, but I don't recall specifically, no.
**Q Did you ever hear Karen Riapos say that Nannette's job really wasn't recruiting at all, but it was just doing VNDLY and the contemporary contingent labor project?**
A No, I don't.
**Q How would you have reacted if Karen had told you that at the time you were trying to get those recruitment reports?**
A I don't think that the two would have overlapped. This was when she reported directly to me.
**Q Ah-ha. So this was -- I'm sorry. Let's put a time frame around this.**
**When you were trying to get this recruitment report from her, this was before Karen Riapos was hired?**
A I can't say for sure, to be honest.
**Q Are there any other times when you were frustrated with Nannette or felt like the communication was strained?**
A On occasion, but it would be a struggle to say

exactly when.
**Q Did you ever give her any kind of performance counseling about that?**
A We had conversations about it.
**Q Were they documented conversations that you said, look, I want to, you know, give you a formal counseling about this and I don't want to have it repeat itself or else I'm going to have to take more formal action?**
A Not that I recall.
**Q Why not?**
A Because we had a conversation about it.
**Q Did you take a note and put it in her file or anything?**
A I'm trying to recall.
I don't recall specifically. But I'm the type of person that keeps pretty good notes. So it could be, yeah.
**Q Do you have any notes on conversations with Nannette?**
A I have no documentation. I left the company a year ago and turned in everything when I left. It's not my property.
**Q Not my property. Okay.**
**Where would you have taken -- would you have**

**given those notes to somebody?**
A Yeah, I turned everything into human resources.
**Q Do you know when you had any notes on -- relating to Nannette?**
A I had a supervisor file, but it would -- I don't recall exactly every document that was in that. It would have likely been the performance appraisal, the one performance appraisal that I did.
**Q And there may have been other documents in it; you just don't remember?**
A I don't recall everything that was in my supervisor file.
**Q Were there notes of conversations with Nannette in that file?**
A Like I say, I don't know for sure. There likely could have been. So just in terms of process, when I have staff meetings, I take notes, and very likely there were probably some notes in that from the file. It's likely. It's hard to say.
**Q Okay. All right. Did you ever consider issuing a PIP to Nannette about her communication style?**
A I don't recall considering a PIP.
**Q I probably asked this, but I just want to make sure. Did Karen talk to you at all about the decision to lay off Nannette?**

A No, sir.
**Q Did you --**
A I don't recall any conversation with Karen about laying her off.
**Q Do you recall having any conversations with Karen during the last six -- about Nannette during the last six months of Nannette's employment, from July 2020 through December 2020?**
A No, not specifically, no. During COVID, we all worked from home, so we rarely saw each other.
**Q Well, I guess that's a good question to ask. Let's focus on September, October, November, December, those last four months then.**
**Do you recall --**
A Of 2021 --
**Q 2020 --**
(Overlapping speech.)
**Q (By Attorney Higgins) 2020, was there ever occasion for you to speak to Karen Riapos or communicate with Karen Riapos about Nannette?**
A No.
**Q All right.**
A I mean, there was no need to. Occasionally I would speak to Karen, because I was always exploring ways to, you know, do more with regard to recruiting in my own

area, which was the international region.
**Q All right. So I don't know that I have very many more questions. If I do, it's just a few. So can we just take another 15-minute break and be back at 11:45 to put a wrap on it?**
A Yeah. I want to clarify one thing.
**Q Sure.**
A So I did transition to the international division in December of '19. On occasion, I was asked questions about the contingent labor program. So that's why you saw those emails after that. And it's really more that I had historical knowledge on it than anything.
I just didn't want to make it sound like I didn't have anything to do with it after that.
**Q Okay. Appreciate that.**
A Because you made the point of those emails being after my transition, and that's true.
**Q Okay. I think the record is pretty clear on that.**
A Okay. All right.
**Q We'll be back in 15.**
(Recess.)
**Q (By Attorney Higgins) Okay. A couple of quick questions, just loose ends.**
**Are you paying for the services of**

**Ms. McFarland or her law firm?**
A No.
**Q When you went to look for another job, did you have a positive reference from Brand, anyone at Brand give you a reference?**
A No.
**Q Okay. I want you to look at the -- just one more area of questions, and then we're done.**
**If you could look at the text thread again, Exhibit 31. If you'd go to the last couple pages, that is sort of the last time you and Nannette texted each other. I assume. I guess that's a good question.**
**Have you been in touch with Nannette since the last text, which was 10/15/2020?**
A So at the top of this document?
Is that where you're talking about?
**Q No, the very bottom of the document.**
A Oh, the very bottom. Okay.
**Q Yeah. On page 36 of 36, there's -- she sends you a link to an article about her family in the Mill Creek Beacon on 10/15/2020.**
**Do you see that?**
A I do see it, yes.
**Q She didn't have anything else on her phone in terms of communications with you.**

**Do you recall having any communications with Nannette on phone, text, email, anything after October 15, 2020?**
A She had reached out to me a couple of times via LinkedIn, which I didn't respond. I don't recall when our last actual interaction was.
**Q And why didn't you respond on LinkedIn?**
A Just didn't feel like it was necessary.
**Q Did you know that she had a lawsuit pending at that time?**
A I was aware that there was a dispute.
**Q How did you find out about that?**
A I don't recall who told me.
**Q Was it someone at Brand?**
A Yeah. It would have had to have been somebody at Brand.
**Q Okay. And you were still working there until March of 2022, which was long after she filed this suit, so you --**
A No. I wasn't -- I didn't work there in March of 2022.
**Q Oh, you know what? I apologize. I was thinking of someone else. I apologize.**
**When did you leave again?**
A Early October 2021.

**Q Okay. Well, suit had been filed by then.**
A Yeah.
**Q Did you hear about -- okay.**
**Did you hear about that before you left Brand?**
A I must have. I can't say exactly when I became knowledgeable of it, but I was part of the human resources leadership team, so I'm sure it was mentioned.
**Q Did anyone ask you to look through your files or emails or documents for relevant information about Nannette?**
A No.
**Q All right. So let's go back to this text thread here, which is she sends you something -- well, she -- if you go up one page, it looks like she sends you a gift of a mug.**
A Yeah.
**Q And I can't see that picture very well, but who's on the mug?**
A Bob Ross, the painter.
**Q Yeah. Bob Ross. Okay. Got it.**
**So was that an inside joke or something?**
A Yeah. Yeah, it was. I'm trying to remember if she was at this meeting.
We had a meeting where we did -- it was an HR meeting. We did the painting, where you go and you

paint, like a team event. And we took some pictures where you hold the thing up and it's a picture of Bob Ross, but it's your face. It was kind of an ongoing joke about Bob Ross.
**Q Got it. So she sends that to you.**
**And then she also says, "You've got something else from me beside the mug."**
**"Yes, ma'am. I got an email that it arrived. Oh, I should check. Ah, got it."**
**And then what is this other thing she sent to you? I can't see that.**
A It was a notebook. It was -- the pages are blank. It's for taking notes.
**Q Does it say "You Are Awesome" on the cover?**
A I believe so. It's hard to see, but I'm pretty sure that's what it says.
**Q And then you wrote to her, "Thank you for thinking about me. You, my friend, are the awesome one."**
A Mm-hm.
**Q You have to say "yes" or "no."**
A Yes.
**Q All right. And then she writes later that day, "I know I haven't gotten the cost saving this year in VNDLY, but I hope you and Meg are still pleased with the work I have done. I looked at having at least 60 percent**

# Exhibit 13

[redacted]

**From:** Newman, Meg
**Sent:** Wednesday, September 23, 2020 8:18 AM
**To:** Riapos, Karen
**Subject:** Re: Thank you for session

Thanks Karen!

Get Outlook for iOS

**From:** Riapos, Karen <kriapos@brandsafway.com>
**Sent:** Wednesday, September 23, 2020 10:48 AM
**To:** Newman, Meg
**Subject:** Re: Thank you for session

Hey Meg,

Sorry for the delay in getting back to you, spotty service in the mountains. Nanette has been involved in the entire RFP process with the MSP and we have spoken in-depth about what they will be doing. I have told her, that she will be the point person for the MSP as well as turning her focus to the ATS implementation and all other TA Ops (careers page, job boards, direct employers, LinkedIn etc.)

At this point, we are finalizing contracts for the MSP which legal is reviewing so no need for her to be involved in this part. I'll be back in civilization on Thursday afternoon so can give you a quick call to catch up.

Thanks!

Karen

Get Outlook for iOS

**From:** Newman, Meg <mnewman@brandsafway.com>
**Sent:** Tuesday, September 22, 2020 9:32:47 PM
**To:** Riapos, Karen <kriapos@brandsafway.com>
**Subject:** FW: Thank you for session

Hey there!

I know you are out this week and I hope you are feeling better, but wanted to share this with you. Nannette followed up with me after a Listening session. I am set to talk to her on Friday, but if you have any insights to share, let me know. Otherwise, I will let you know how it goes.

Thanks,

Meg

Meg Newman
Brand Industrial Services

1325 Cobb International Drive Ste. A-1
Kennesaw, Georgia 30152
BRAND SAFWAY
P 678-214-4553
mnewman@brandsafway.com

---

**From:** Newman, Meg
**Sent:** Tuesday, September 22, 2020 8:47 PM
**To:** Basa, Nannette <nbasa@brandsafway.com>
**Subject:** RE: Thank you for session

Hi Nannette,

Thanks so much for reaching out. I will find time for us to talk through your concerns.

Thanks as well for sharing the article, it's very impressive how you and your family adapted to homeschooling. I am so impressed with your foresight and how you built cubicles in your home!! I definitely want to hear more about that!!

Talk to you soon!

Meg

Meg Newman
Brand Industrial Services
1325 Cobb International Drive Ste. A-1
Kennesaw, Georgia 30152
BRAND SAFWAY
P 678-214-4553
mnewman@brandsafway.com

---

**From:** Basa, Nannette <nbasa@brandsafway.com>
**Sent:** Monday, September 21, 2020 2:26 PM
**To:** Newman, Meg <mnewman@brandsafway.com>
**Subject:** Thank you for session

Hi Meg,
I wanted a chance to speak to you further about VNDLY and the contingent labor program. Please let me know when you have time. The program is continued to expand and evolve and although I understand there is plans to bring in an MSP-I am not included in the scope of the MSP nor what plans are for me in the future.

On a separate note, this is an article that was published last Friday in our community newspaper. It's on our family and remote learning.
https://www.millcreekbeacon.com/story/2020/09/18/news/remote-learning-is-a-fit-for-local-family/11689.html

Nannette

Nannette Basa|Talent Acquisitions Manager
**Brand Industrial Services**
**425.951.0818**
nbasa@brandsafway.com|www.brandsafway.com

# Exhibit 14

**Cody Fenton-Robertson**

| | |
|---|---|
| **From:** | Amy Rostad (Lakeside Reporting) <amy@lakesidereporting.com> |
| **Sent:** | Thursday, October 6, 2022 2:26 PM |
| **To:** | Cody Fenton-Robertson |
| **Cc:** | Lakeside Reporting; Alexander Higgins (alex@alexjhiggins.com) |
| **Subject:** | Re: Deposition of Karen Riapos, reported Friday, June 3, 2022 - BASSA v. BRAND SHARED SERVICES, LLC |

Hi, Cody,

We did not receive an errata back on that deposition.

Best wishes,

Amy P. Rostad, RPR
CCR No. 1901 (WA)
CSR No. 21-0010 (OR)
BCSRA No. 524 (BC)
Lakeside Reporting
833.365.3376
www.lakesidereporting.com

**Please note: We recommend booking at least 1-2 weeks in advance for remote proceedings and 3-4 weeks in advance for in-person proceedings. In-person availability is based solely upon the availability of our in-person reporters.

We are currently waiving our fees/upcharges for remote videoconferencing services. We appreciate all of our clients. Take care, stay healthy, and let us know how we can help! **

On Oct 6, 2022, at 2:22 PM, Cody Fenton-Robertson <cody@beanlawgroup.com> wrote:

Hi Amy,

Do you know if Karen Riapos ever returned the errata sheet with corrections?

Thanks
Cody

---

**From:** Lakeside Reporting <contact@lakesidereporting.com>
**Sent:** Friday, June 17, 2022 5:37 PM
**To:** alex@alexjhiggins.com; Cody Fenton-Robertson <cody@beanlawgroup.com>; ekazaryan@seyfarth.com; hmcfarland@seyfarth.com; Matthew Bean <matt@beanlawgroup.com>
**Cc:** vmacan@seyfarth.com
**Subject:** Deposition of Karen Riapos, reported Friday, June 3, 2022 - BASSA v. BRAND SHARED SERVICES, LLC

Good evening,

Please find attached, the transcript in multiple formats (PTX/PDF/Condensed PDF) and the original filing letter. **Signature was reserved**. Here is a link to the exhibits, ***which will EXPIRE in 8 days***: https://www.sendthisfile.com/0RBT8GaQzD8dL89HPowWYzUf

**ATTORNEY KAZARYAN:** Please forward your copy of the transcript to the witness to review. We have attached a blank errata sheet and declaration to this e-mail for the witness to complete and sign. ***Please reply all to this e-mail and attach the signed errata sheet and declaration within 30 days of this e-mail or before the trial date, whichever occurs first.***

Please contact our office if you have any questions/concerns.

Amy Rostad, RPR
CCR No. 1901 (WA)
CSR No. 21-0010 (OR)
BCSRA No. 524 (BC)
Lakeside Reporting
833.365.DEPO (3376)
www.lakesidereporting.com



# Exhibit 15

Conversation between Nannette's iPhone (+14259510818) and Rod (9852102709)

4/5/2018 1:31 PM (Viewed 4/5/2018 1:32 PM)

Rod (9852102709)

I'm in the weeds with Merit. Do you have anything pressing? Wait .... are you still skiing?

4/5/2018 1:33 PM

Nannette's iPhone (+14259510818)

Nope I'm good

4/5/2018 1:33 PM

Rod (9852102709)

Good deal.

4/5/2018 1:33 PM

Rod (9852102709)

Thx

4/24/2018 5:09 PM

Nannette's iPhone (+14259510818)

Rod, relax on the temp labor. as long as the other E&I HR members do what Leslie Mayo does, we should easily hit our target $. I was very creative on how I got to Corp savings and Dan mentioned to me on a call with C&I that Finance approved my justification. Feel free to call me, but I think we got this!and may also have high chances of exceeding our goals

5/17/2018 5:34 AM (Viewed 5/24/2018 1:35 PM)

Rod (9852102709)

I'm doing an org chart for a meeting next week. We've been asked to add pictures. Can you send me a selfie please?

5/30/2018 5:13 AM (Viewed 5/30/2018 5:18 AM)

Rod (9852102709)

Do you want to carpool to the office with Casey and I?

5/30/2018 5:18 AM

Nannette's iPhone (+14259510818)

Yes

5/30/2018 5:21 AM

Rod (9852102709)

Ok. Having some breakfast. Leaving in 15idh.

5/30/2018 5:21 AM

Rod (9852102709)

Ish

5/30/2018 5:21 AM

Nannette's iPhone (+14259510818)

We are downstairs

5/30/2018 5:22 AM

Rod (9852102709)

Ok. Where?

5/30/2018 4:24 PM (Viewed 5/30/2018 4:26 PM)

Rod (9852102709)

Just got here. 15 min?

5/30/2018 4:26 PM

Nannette's iPhone (+14259510818)



2017=$28Million spend
2018=$17.5
11/5/2019 10:25 AM
Nannette's iPhone (+14259510818)
2019=$14mil
11/5/2019 10:27 AM
Rod (9852102709)
These are brand and Safway combined, yes?
11/5/2019 10:27 AM
Rod (9852102709)
And
11/5/2019 10:28 AM
Rod (9852102709)
The reduction is because of the reduced newly negotiated vendor rates?
11/5/2019 10:32 AM
Nannette's iPhone (+14259510818)
Just emailed you the ppt from 2018
11/5/2019 10:32 AM
Nannette's iPhone (+14259510818)
The rest was combo savings
11/5/2019 10:33 AM
Rod (9852102709)
Ok thx
11/5/2019 10:36 AM (Viewed 11/5/2019 10:37 AM)
Rod (9852102709)
Any idea how many people this is ?
11/5/2019 10:37 AM
Rod (9852102709)
I see your slide says 191
11/5/2019 10:38 AM
Nannette's iPhone (+14259510818)
Ok
11/5/2019 10:39 AM
Nannette's iPhone (+14259510818)
Do you need more info?
11/5/2019 10:39 AM
Rod (9852102709)
How many people over all on average do we have for temps?
11/5/2019 10:40 AM
Rod (9852102709)
can we talk again?
11/5/2019 10:45 AM
Nannette's iPhone (+14259510818)
Yes
11/5/2019 10:45 AM

3/12/2020 11:39 AM

Nannette's iPhone (+14259510818)

Feeling like the past two years of capturing almost $4m in cost savings is not being recognized

3/12/2020 11:39 AM

Nannette's iPhone (+14259510818)

I get calls to run similar programs at other companies

3/12/2020 11:40 AM

Nannette's iPhone (+14259510818)

Let me know if I should start pursuing

3/12/2020 11:43 AM

Rod (9852102709)

Nannette you are over reacting.

3/12/2020 11:44 AM

Nannette's iPhone (+14259510818)

I don't think so, your draft did not mention my name at all

3/12/2020 11:45 AM

Nannette's iPhone (+14259510818)

And going to Daniel, yes he has helped but I did most of the negotiations on my own

3/12/2020 11:45 AM

Nannette's iPhone (+14259510818)

It appears his advice is considered more than mine

3/12/2020 11:50 AM (Viewed 3/12/2020 11:51 AM)

Rod (9852102709)

Schedule 30 minutes with Karen to talk on this. I can try to join. As mentioned before the message to the vendor needs to come from a senior level. This is a priority from the CEO so I understand if you are feeling pressure, we all are. I never asked for advise from Dan it data. I'm not able to hash this out any further with you. I'm sorry you feel this way but we have to push on strong on this effort. You can decide what you need to do. I'll try to be available if you want to talk further with Karen.

3/12/2020 11:53 AM

Nannette's iPhone (+14259510818)

Ok, but I'm not feeling pressured

3/12/2020 11:53 AM

Nannette's iPhone (+14259510818)

I have lived this program for the past 2 years

3/12/2020 11:53 AM

Rod (9852102709)

Ok...

3/12/2020 11:59 AM

Rod (9852102709)

I know. You are the expert. How do we get a good list of contact information?

3/12/2020 12:01 PM

Nannette's iPhone (+14259510818)

One way is via websites

3/12/2020 12:01 PM

Nannette's iPhone (+14259510818)

But the better way is to connect with the Branches

Nannette! I hope all is good for you. I miss working with you as well. Seems like I'm on endless calls these days. What's your ski question?

5/14/2020 9:34 AM

Nannette's iPhone (+14259510818)

Credits from Vail

5/14/2020 9:35 AM

Rod (9852102709)

Yes !!!! I'm getting 20% off of next years pass

5/14/2020 9:37 AM

Nannette's iPhone (+14259510818)

Ok, that sounds right. Because you got to ski more than I did. I get 66%

5/14/2020 9:38 AM

Rod (9852102709)

Nice. I saw the email with the sliding scale. Totally a good deal. Glad you still have the ski bug.

5/14/2020 9:39 AM

Nannette's iPhone (+14259510818)

Just worried that they won't let us into Canada

5/14/2020 9:46 AM (Viewed 5/14/2020 10:05 AM)

Rod (9852102709)

Ah. Good point. Plenty of options.

6/9/2020 4:11 PM

Nannette's iPhone (+14259510818)

Something broken in my VNDLY excel report. I don't have it broken down by branches yet only businesses. Can I have another day?

6/9/2020 4:12 PM

Rod (9852102709)

Yikes. Ok Yes.

6/9/2020 4:13 PM

Nannette's iPhone (+14259510818)

Thanks

6/10/2020 11:24 AM

Nannette's iPhone (+14259510818)

McDaniel has the file, he didn't like my V lookups and changing it to indexing. And I think he is just incorporating into his excel file

6/10/2020 2:25 PM (Viewed 6/10/2020 2:38 PM)

Rod (9852102709)

Ok

8/12/2020 2:45 PM

Nannette's iPhone (+14259510818)

Hi Rod, just thinking of you today and also letting you know the Aluma Branches in the west are so awesome to work with. We have accomplished so much with VNDLY and yard laborers in the past few months

8/14/2020 10:02 AM

Rod (9852102709)

Hey Nannette. Thanks for the message. And thank for thinking of me. Sorry to take so long to respond.

Truly appreciate the VNDLY push. We need it. It's been busy around the world for F&S.