1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____
                                    )
4    NANNETTE BASA, an individual,   ) C21-00754-MLP
                                    )
5                    Plaintiff,      ) SEATTLE, WASHINGTON
                                    )
6    v.                              ) October 18, 2022 -
                                    ) 1:00 p.m.
7    BRAND SHARED SERVICES, LLC, a   )
     Delaware corporation,           )
8                                    ) ORAL ARGUMENT via
                     Defendant.      ) Zoom Platform
9                                    )
     _____

10
              VERBATIM REPORT OF PROCEEDINGS
11      BEFORE THE HONORABLE MICHELLE L. PETERSON
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
12   _____

13

14   APPEARANCES:

15   For the Plaintiff:       Alexander J. Higgins
                              Law Offices of Alex J. Higgins
16                            2200 Sixth Avenue
                              Suite 500
17                            Seattle, WA  98121

18                            Cody Fenton-Robertson
                              Bean Law Group
19                            2200 Sixth Avenue
                              Suite 500
20                            Seattle, WA 98121

21

22   For the Defendant:       Helen McFarland
                              Emma J. Kazaryan
23                            Seyfarth Shaw
                              999 Third Avenue, Suite 4700
24                            Seattle, WA 98104

25

       Proceedings stenographically reported and transcript produced with computer-aided technology

 1          THE CLERK:  Good afternoon, Your Honor.

 2      The United States District Court for the Western District of

 3  Washington is now in session, the Honorable Michelle L. Peterson

 4  presiding.

 5      Your Honor, the matter before the Court this afternoon is

 6  oral argument in Case 21-CV-754, assigned to Your Honor, Nannette

 7  Basa versus Brand Shared Services, LLC.

 8      Counsel, please make your appearances, beginning with

 9  plaintiff.

10          MR. HIGGINS:  Good afternoon, Your Honor.  Alex Higgins

11  for the plaintiff, Nannette Basa.

12          MS. MCFARLAND:  And good afternoon, Your Honor.  Helen

13  McFarland here for the defendant, Brand.

14          THE COURT:  Good afternoon, Mr. Higgins and

15  Ms. McFarland.

16      We, as I think Mr. Farrell just said, are here on two

17  motions.  The first one is a motion to compel, which is found at

18  Docket No. 32, that was filed by the plaintiff in this case.  I

19  have reviewed the motion, as well as the opposition at Docket

20  No. 37, the reply at Docket 44, and the supporting documents

21  filed with that.

22      We're also here on a motion for sanctions for spoliation.

23  That was also filed by the plaintiff at Docket No. 30.  I have

24  reviewed that.  I have also reviewed the opposition at Docket

25  No. 39 and the reply at Docket No. 46, as well as the supporting

1    documents filed in support or opposition of that motion.

2        All right.  I think what makes sense, I'm going to start with

3    what I think is the easier of the two motions, and that's the

4    motion with respect to the privileged-document motion to compel.

5    I have reviewed, as I said, everything, and, frankly, I have

6    questions for defense counsel.

7        I don't have many questions for you, Mr. Higgins, but I will

8    give you -- I'm going to let Ms. McFarland respond to your reply

9    brief first, and then I, of course, will give you the last word.

10       Ms. McFarland, I have reviewed it.  It seems to me that

11   Mr. Higgins at this point has somewhat conceded that you have

12   provided sufficient information with respect to that worksheet to

13   determine whether or not it is privileged.  One thing that I

14   could not tell from the pleadings is whether or not this was a

15   document that was prepared for the attorney and then not shared

16   outside of that communication with the attorney.  Is that what

17   you're representing to the Court?

18           MS. MCFARLAND:  Yes, that's my understanding, is that

19   this was prepared for the attorney and for legal advice.

20           THE COURT:  And not shared outside of that communication

21   with the attorney?

22           MS. MCFARLAND:  Yes, that's right.

23           THE COURT:  Okay.

24       Mr. Higgins, that appears to have been a document that was

25   created for communication with an attorney, it wasn't shared

 1  outside the need-to-know group at the company, and it appears

 2  that there's sufficient information to find that is, in fact,

 3  privileged.  But I did say I would give you the last word,

 4  Mr. Higgins.

 5        MR. HIGGINS:  Yes.

 6     I believe the testimony is -- and I'm looking for it

 7  exactly -- that it was provided to share with -- Michelle Roman

 8  created it, who's a senior vice president of HR, and she provided

 9  it to share with her boss, Meg Newman, for her approval, and then

10  the document was also shared with the legal department.  I'm not

11  finding that exact testimony right now.

12     But our position is that it has a dual purpose at least.  It

13  has a business purpose, as indicated from the term "Corporate RIF

14  Worksheet."  Not legal, not legal worksheet, not, you know,

15  lawyer, you know, attorney's eyes only, lawyer.  And there's no

16  communications along with that work where she's saying, "Please

17  do a legal review" or anything like that, and no correspondence

18  back from the lawyer saying, "Here is my legal analysis."  So

19  we're just very suspicious about the claim and that it was just

20  sort of routed through an attorney in order to claim privilege,

21  not that it was created solely for legal review.

22     I guess I would ask, since I'm having trouble finding the

23  citation, where is the citation that the defendant is relying on

24  that it was purely for legal purposes.

25        It seems from the deposition testimony of Michelle Roman that

1    she got approval from her boss -- gosh, I wish I could put my

2    finger on that, I apologize.  I guess it's from her deposition

3    testimony, which we attached, where she says she got approval

4    from her boss regarding the layoffs, when submitting the names,

5    and then submitted it to legal.  So it's a little vague, I grant

6    you that.  I think the deposition testimony is a little vague.

7        But was there a declaration provided by Ms. Roman that it was

8    purely for legal purposes?  I may have missed that.

9            MS. MCFARLAND:  No, we did not provide a declaration

10   from Ms. Roman.  But I will represent to you that it was

11   presented by Ms. Roman to legal counsel for advice on the layoff.

12   Ms. Roman no longer works for the company.  If we need to get a

13   declaration from her, Your Honor, I mean, I suppose we could do

14   that, or we could -- I mean, the lawyer actually no longer works

15   for the company either.  So it would be a little bit difficult to

16   try to do that.  But I can represent to you that that was the

17   purpose of this communication.

18           THE COURT:  And, frankly, the Court will take your

19   representations with respect to that.

20       I just have a clarification.  Was it a document that

21   Michelle Newman -- is it Newman?  No.

22           MS. MCFARLAND:  Michelle Roman.

23           THE COURT:  Roman.  Michelle Roman created the document,

24   sent it to the attorney, the attorney gives advice, and then the

25   document is sent to Meg Newman for approval?

1          MS. MCFARLAND:  No, no.  She prepared a document to

2    speak with legal counsel and then used it to speak and

3    communicate with legal counsel.

4          THE COURT:  Okay.  But there was a discussion

5    about somehow Meg Newman came into this?

6          MS. MCFARLAND:  Yes.  At some point, Meg Newman, who was

7    the head of the human resources department, knew who was going to

8    be selected for layoff.  So, you know, I don't know exactly what

9    Mr. Higgins is referencing.  It sounds like he was talking about

10   a specific portion of Ms. Roman's deposition, but I don't believe

11   that that was -- she did not testify, as far as I recall, that

12   she shared that document with Meg Newman.  She reported that she

13   eventually obtained approval for the layoffs in her department

14   from Meg Newman.

15         MR. HIGGINS:  I think that's fair.  But I think it

16   underscores the problem with not having an appropriate privilege

17   log as of September 7 when I took Michelle Roman's deposition.  I

18   didn't know this document existed.  I didn't know to ask her what

19   was the purpose of this document.  "Did you ever share it with

20   anyone other than Ms. Newman?"  So it's very easy to say now

21   that's what it is.  But I don't think that counsel can represent

22   for Michelle Roman what she did, given the fact that she doesn't

23   have access to Ms. Roman as she's no longer -- she says she's no

24   longer with the company.

25         I think it would be appropriate for a very brief reopening of

 1   Ms. Roman's deposition so we can find out those questions that we

 2   should have been able to find out the first time we took her

 3   deposition.  We took about a 90-minute deposition, so it wasn't

 4   like we were beating every horse in the room.

 5          THE COURT:  All right.  I agree.  I will order the

 6   reopening of Michelle Roman's deposition for no longer than -- I

 7   mean, 60 minutes should be plenty of time.

 8          MR. HIGGINS:  Yes, Your Honor.

 9          MS. MCFARLAND:  And --

10          MR. HIGGINS:  More than enough, yeah.

11          THE COURT:  Okay.  As to the sole issue with respect to

12   the privilege surrounding the worksheet, and the reason that I do

13   agree with Mr. Higgins is this is a worksheet that appears to go

14   through the bases for identifying/selecting employees for

15   reduction in force, as well as why those employees were selected,

16   so I do think it's an important document, and because Mr. Higgins

17   says that he didn't have the privilege log at the time that he

18   was deposing Ms. Roman or sufficient information from the

19   privilege log, he was unable to ask questions about that.

20      Okay.  Ms. McFarland, you wanted to interject?

21          MS. MCFARLAND:  Thank you, Your Honor.

22      I just wanted to note that we have five more depositions

23   between now and next week, and I actually don't think we have

24   time.  And I don't have -- I mean, I don't know for sure whether

25   Michelle Roman -- she doesn't work for the company anymore --

1  whether I will be able to squeeze her in in between now and, you

2  know, Friday of next week.

3      But we also do have Meg Newman's deposition coming up on the

4  27th.  So if we could, Your Honor, I would ask that you revisit

5  that issue because rather than bring in a new person, we already

6  have Meg Roman {sic} to testify, and she can address whether she

7  saw this exhibit or not.

8      THE COURT:  Yeah.  But we want to know -- I mean,

9  Michelle Roman is the one that created the document and met with

10  counsel, and I think Mr. Higgins is entitled to explore whether

11  or not, you know, it was actually a privileged communication and

12  a privileged document.  So I understand what you're saying.

13      I will, for the purposes of Ms. Roman's deposition only, I

14  will allow the deposition to be outside the close of discovery,

15  but it needs to be within like a week or ten days of the close of

16  discovery.

17      MS. MCFARLAND:  Okay.  I will do my best.  I will reach

18  out to her and see if I can get her cooperation.

19      THE COURT:  Okay.  And if not, Mr. Higgins is going to

20  have to subpoena her, as I understand.

21      MS. MCFARLAND:  Okay.

22      Your Honor, one other point -- and maybe this is a good time

23  to address it -- we were hoping, and I raised this issue with

24  Mr. Higgins before, but my associate, who is on this call, Emma

25  Kazaryan, has been involved in this case from the outset, and

1    she's actually due to have her first baby at the end of this

2    month, and so we were hoping to get a trial continuance so that

3    she could be available to try this case in the event that we're

4    not able to resolve it on summary judgment.  Mr. Higgins said he

5    was not able to give me a response on whether they would

6    stipulate to that or not.  But without moving the other

7    deadlines, we were hoping we could move the January 30th trial

8    date.

9            THE COURT:  I would prefer you submit that in writing

10   and set forth a good cause for the trial continuance.

11           MS. MCFARLAND:  Okay.

12           THE COURT:  There hasn't been a trial continuance; is

13   that right?

14           MS. MCFARLAND:  I think plaintiff requested one at one

15   point, which we stipulated to.  So this would be the first

16   request from defense.

17           THE COURT:  Okay.  Well, confer with Mr. Higgins, and

18   hopefully you can work with Mr. Farrell on a new trial date, if

19   you submit the motion.  And in your motion, obviously, you want

20   to propose a new trial date.

21           MS. MCFARLAND:  Thank you.

22           THE COURT:  Okay.  So with respect to the motion to

23   compel, I will grant it to the extent that I am allowing

24   Mr. Higgins to further explore the circumstances surrounding the

25   RIF worksheet that Ms. Roman prepared by taking Ms. Roman's

1    deposition outside the close of discovery for no longer than

2    60 minutes.  And I appreciate that Ms. McFarland will work with

3    Ms. Roman to schedule that, to the extent Ms. Roman is amenable

4    to that.

5        All right.  Now, let's talk about Docket No. 30, which is the

6    motion for sanctions for spoliation of evidence.  All right.  I

7    have reviewed that, as I said, and I'm going to do the same

8    thing, Mr. Higgins.  I'm going to start with Ms. McFarland,

9    because I have quite a bit more questions for her than I do for

10   you at this time, and then I will give you the last word.

11       Ms. McFarland, one thing that was noticeably absent from your

12   opposition was any discussion of the Teams messaging system, and

13   it seems that -- I believe it was Ms. Roman that testified that

14   she communicated frequently using the Teams messaging system.

15           MS. MCFARLAND:  So we -- Your Honor, thank you.  We have

16   produced the Teams -- we exhaustively searched the Teams

17   documents, and there weren't many because they're just --

18   Michelle Roman was not a supervisor and she wasn't really

19   involved with Ms. Basa until the layoff.  So we did produce, you

20   know, all of the Teams messages that we were able to find, and

21   there were, you know, only maybe two, I believe.  And so

22   that's -- that's -- and we have searched for all of those Teams

23   messages, and there really aren't any.  So I apologize for not

24   addressing that more thoroughly in the briefing.

25           THE COURT:  Okay.  Is there any information in the

 1  record?  Does Mr. Higgins have information as to how that search

 2  was conducted and what search terms were used?

 3          MS. MCFARLAND:  Mr. Higgins and Mr. -- and Mr. -- I'm

 4  blanking on Cody's last name.  Both plaintiff's counsel and our

 5  side have been very extensively involved in search terms

 6  throughout the course of this litigation.  And, yes, I believe --

 7  and I believe that either Emma or Cody could jump in on this --

 8  we have been back and forth on lots of search terms, and I

 9  believe all of those were approved by both sides and that all of

10  those searches were conducted.

11          THE COURT:  And for clarification, did your litigation

12  hold letter discuss preserving Teams Messenger messages?

13          MS. MCFARLAND:  Yes.

14          THE COURT:  So the custodians would have been on notice

15  that they needed to preserve those?

16          MS. MCFARLAND:  Yes.

17      And, Your Honor, we also have another deposition, I think,

18  scheduled to address this next week.

19          THE COURT:  All right.  So the next question that I

20  have -- and, Ms. McFarland, stop me if this is in the record, but

21  I didn't see it -- is after becoming aware of the potential

22  lawsuit in January of 2021 and prior to Mr. Broschinsky --

23          MS. MCFARLAND:  That's correct.

24          THE COURT:  -- Broschinsky's departure, what steps did

25  Brand take to preserve the information that he had with respect

1  to this lawsuit?

2  MS. MCFARLAND:  So Mr. Broschinsky, we lost -- and I

3  admit this, and I think it is in our documentation.  I mean,

4  Mr. Broschinsky left the company, and when he turned in his cell

5  phone, it was submitted to, I don't know exactly what -- some

6  third-party vendor that wipes it clean, and so we don't have his

7  text messages.  You know, I think whatever they do with cell

8  phone messages -- whatever they do with cell phones when they

9  turn them back in, it's not something that the company keeps

10 anymore.

11 THE COURT:  What I was asking -- I will get to that --

12 but I think let's take it in steps.  The first step is what did

13 the company do to put Mr. Broschinsky on notice that he has to

14 preserve information related to this lawsuit?

15 MS. MCFARLAND:  Well, we contacted him and informed him

16 about the litigation and spoke with him and asked him to

17 preserve.

18 THE COURT:  When was that?

19 MS. MCFARLAND:  So I don't know the exact date, but I

20 think it was shortly after the lawsuit was filed.

21 THE COURT:  So not in January of 2021?

22 MS. MCFARLAND:  I don't believe it was in January of

23 2021, but I can't confirm that.

24 THE COURT:  All right.  And remind me when the lawsuit

25 was filed.

 1          MS. MCFARLAND:  It was filed in July of 2021.

 2          THE COURT:  And he left in October.

 3     And the notification to Mr. Broschinsky, the preservation

 4     notification, you're saying it was verbal; it wasn't in writing?

 5          MS. MCFARLAND:  I don't have all of those details

 6     because the in-house counsel for Brand is no longer with us.  But

 7     I believe it was verbal.

 8          THE COURT:  And have you made any attempts to confirm

 9     whether or not or what he was told about preservation of

10     evidence?

11          MS. MCFARLAND:  Yes.  And we had spoken with him.  So I

12     don't have -- I have not been able to speak with the prior

13     counsel, who's no longer with the company.

14          THE COURT:  And then when Mr. Broschinsky left the

15     company, there was no effort made to obtain information from his

16     devices or his files that relate to this communication, or was

17     there an effort made to obtain information?

18          MS. MCFARLAND:  Well, we have all of his e-mails, we

19     have all of his Teams messages.  You know, those were all backed

20     up as a matter of course.  The documents that are missing were

21     from his cell phone, the text messages, and he kept a hard copy

22     paper file in Georgia.  It was his supervisor file.

23     I know that in the reply Mr. Higgins and plaintiff made

24     reference to a performance evaluation.  There was no separate

25     performance evaluation that was not contained within Ms. Basa's

1    original personnel file.

2         THE COURT:  How would you know that?  How would you know

3    that if you don't have the paper file?

4         MS. MCFARLAND:  Well, because he -- any personnel -- he

5    was her supervisor for one year, and he prepared and submitted a

6    performance evaluation, which is part of her file.

7         THE COURT:  Okay.

8         MS. MCFARLAND:  And we have produced that.  That has

9    been produced.

10      So he testified that he kept some notes in a hard copy file

11   that was in Georgia.  He left the company, and because of COVID,

12   you know, his file was somewhere in a storeroom or something in

13   Georgia, and we have been -- we've had exhaustive searches

14   looking for this file.  It was a banker's box or something in

15   which he kept manager files, not just on Ms. Basa, but anyone

16   that he was supervising, and that whole box is missing.

17        THE COURT:  I guess what I'm struggling with is you

18   receive the lawsuit, or in-house counsel receives the lawsuit.

19   Mr. Broschinsky is a potential witness in the lawsuit.  This is

20   July of 2021.  Mr. Broschinsky is still an employee of the

21   company.  And at that time there's no effort to get the personnel

22   file that Mr. Broschinsky kept on Ms. Basa?

23        MS. MCFARLAND:  We fell short there on getting it.

24        THE COURT:  Okay.  And as far as you know, was there any

25   discussion or attempt to get the text messages from his cell

1    phone that was wiped?

2         MS. MCFARLAND:  Not before it was wiped.

3         THE COURT:  Well, it would have to be before, unless

4    they didn't do a very good job of wiping it.

5         MS. MCFARLAND:  So, no.  No.

6         THE COURT:  All right.  And you can tell me -- I don't

7    think this is privileged -- but were you involved in the

8    litigation hold or your firm involved, or is this something that

9    was handled completely in-house?

10        MS. MCFARLAND:  It was completely in-house.

11        THE COURT:  Okay.  And then when did your law firm --

12   has your law firm been involved in the preservation or notifying

13   employees of their preservation obligations?

14        MS. MCFARLAND:  Yes.

15        THE COURT:  Okay.  When did your -- and I think it's in

16   there -- but when did your preservation letter go out?

17        MS. MCFARLAND:  I don't have -- I don't have it in front

18   of me.  But shortly after we -- shortly after we represented --

19   you know, appeared or took on representation of this case, which

20   was after --

21        THE COURT:  Okay.  So sometime you think maybe in August

22   of 2021?

23        MS. MCFARLAND:  Yes.  Yes.

24        THE COURT:  And so would your letter, your preservation

25   letter, have gone to Mr. Broschinsky?  It should have, right?

 1            MS. MCFARLAND:  I think so.  Yes, it should have.

 2            THE COURT:  What I'm struggling with, Ms. McFarland, is

 3   we're here on a motion to sanction your client for spoliation of

 4   evidence, and you don't have a good grasp of the facts that

 5   surround the allegations contained in the motion.  And so I don't

 6   want to unduly prejudice you.  I mean, you should have prepared,

 7   frankly.  But I have concerns about how the preservation process

 8   happened in this case and why, you know, from January of 2021

 9   until after Mr. Broschinsky leaves in October of 2021, nobody

10   reached out to him and collected information relating to

11   Ms. Basa, who has, like, clearly filed a lawsuit against the

12   company.  And so, you know, there's merit to Mr. Higgins' motion

13   in this regard with respect to, you know, whether or not there's

14   been spoliation of evidence.  I'm not satisfied with your answers

15   to my questions with respect to why these simple tasks were not

16   undertaken to collect relevant information.  But I'm going to

17   hear from Mr. Higgins.

18        And I believe that all the other text messages have been

19   resolved and we're really just dealing with Mr. Broschinsky, is

20   that right, Ms. McFarland, as far as you know?

21            MS. MCFARLAND:  As far as I know, there were no other --

22   I know that Karen Riapos and Michelle Roman don't have any text

23   messages with plaintiff.

24            THE COURT:  Or about plaintiff?

25            MS. MCFARLAND:  Or about plaintiff, correct.

1          THE COURT:  All right.  Mr. Higgins, I will give you an

2     opportunity to present your positions.

3          MR. HIGGINS:  Well, I don't agree that it's been

4     resolved, that nobody else had any text messages about the

5     plaintiff.  In fact, I find that hard to believe, that Karen

6     Riapos never texted anybody about plaintiff during the year she

7     was her manager.  And I think what happened is the same thing

8     what happened to Mr. Broschinsky's phone.  Nobody ever texted

9     him -- nobody ever searched it, and that was the troubling thing.

10     We know that Nannette fastidiously preserved her text

11     messages because we told her to, whether they were good or bad.

12     And when we turned them over, she had some text messages with Rod

13     Broschinsky.  We weren't getting those from the defendant.  We

14     kept asking, "Where are the test messages that are responsive?"

15     "We have given you everything" was the answer; there's nothing

16     more.  We knew there was a problem with that, so we kept asking

17     about it.

18     We asked Karen Riapos, "Did anybody look at your phone?  Did

19     you search your phone?"  She says, "No."  I asked her three or

20     four different ways.  "Did you give your phone to somebody to

21     search?"  "No."  "So you never searched your phone for anything

22     to do with Nannette Basa?"  "No, I didn't."  I mean, her answers

23     were crystal clear in that deposition.

24     And from that day forward, we have been asking Brand, from

25     June 3rd, where are these text messages that probably exist that

1   are responsive to the discovery in this case:  your layoff

2   process, your layoff selection, the plaintiff's performance

3   issues that you claim were one of the reasons for her layoff.

4   Absolutely nothing.  And we think the reason is, nobody ever

5   searched for them and they were lost.  And we have evidence of

6   that from Rod Broschinsky and we have evidence of that from the

7   Teams messages and we have evidence of that from the supervisory

8   file that wasn't maintained.  I think "Where there's smoke,

9   there's fire" is a very apt analogy here.  So we don't agree that

10  everything else is fine.  We think there are a lot of missing

11  text messages.

12      Now, on the Microsoft Teams issue, they don't respond to it

13  directly, but there's an indirect admission in Ms. Riapos's new

14  declaration, where she says:  I didn't have text messages because

15  I really didn't use text messages that much; I used Microsoft

16  Teams and e-mails.  Okay.  Well, where are your Teams messages?

17  We don't have anything from her.  We have a couple from Michelle

18  Roman, but that's it, two.

19      Ms. Riapos put in e-mails things that are helpful to

20  plaintiff's case.  We attached as Exhibit 13 to my declaration

21  communications about the plaintiff with her boss, Meg Newman.

22  Meg Newman wants to know:  What's the future for the plaintiff?

23  She is asking me, and I really don't know Ms. Basa very well.

24  This is two months before the layoff.  It goes to Karen Riapos

25  who e-mails back and says:  Well, I have these plans for her to

1   do this, that, and the other thing; I have these ideas for her.

2   Not a whisper about performance issues.  That is very telling

3   evidence that we need to use at trial to show that these

4   performance issues were made up after the fact.  That's not the

5   reason at all she was selected for layoff.  And I think we would

6   find a lot more if we had the text messages, if we had the Teams

7   messages, but they were just not preserved.

8       So the answer to the question, I think Ms. McFarland was

9   truthfully telling you that they have been searching.  I don't

10  doubt that at all.  The problem is they didn't preserve them,

11  they didn't assure preservation -- somebody didn't, Brand -- and

12  so when they did get around to searching for them, they were

13  gone.

14      So what has not been communicated to the Court is when did

15  they preserve these things and who did they tell to preserve and

16  how did they tell them to preserve.  That's completely gone.

17      And Ms. Riapos's claim in her declaration that, "Oh, I now

18  remember I did search my phone."  She conveniently leaves out

19  when.  Was it two days before her deposition?  Was it two days

20  after?  That's June of 2022.  That's a year and a half after you

21  get notice of dispute.

22      So there are many, many, many questions raised by this

23  spoliation that go far and wide in this case with regard to Rod

24  Broschinksy's supervisory file and on.

25      Now, I want to mention that supervisory file because I think

1  there's a misunderstanding here.  Mr. Broschinsky has a

2  performance appraisal that he drafted that I don't think was ever

3  submitted into the system, and it's because he was no longer her

4  manager; it didn't really matter to him.  He was only her manager

5  for, I think, until August -- I can't remember the year -- but it

6  was a partial year, and then Karen Riapos comes in and takes

7  over.  And so she wanted him to do the review, but it just fell

8  through the cracks.  We think that's the review from 2019 that's

9  in that supervisory file.  So that appraisal has never been

10  produced.  And that's the point we were trying to make --

11       THE COURT:  Oh, I see.

12       MR. HIGGINS:  -- in our briefing.

13  I have a couple other notes from some of the comments.

14  The litigation hold letter about Teams messages, I don't know

15  if that's true or not.  I mean, it may have been.  But, again, if

16  it was done in August or September of 2021, that would be long

17  after people might have deleted those things.  I mean, I don't

18  know much about how things are stored.  We have a 30(b)(6)

19  deposition next week.  Maybe I will become better educated, but

20  I'm afraid I'm going to get tech speak and it's going to go over

21  my head, but I'll try.

22  All right.  I think these verbal notices of hold are frankly

23  just -- I have never heard of them before, but I don't think they

24  should be given a lot of weight, especially since the person who

25  gave them may no longer be with the company, as I understand it,

 1   and has not submitted a declaration.

 2       When Mr. Broschinsky left, there was no effort to obtain his

 3   files.

 4       I talked about the performance appraisal.  I apologize.

 5       Oh, the text messages that were wiped.  We believe others as

 6   well.

 7       I think I covered what I wanted to cover from what was stated

 8   by Ms. McFarland, but I'm happy to answer other questions the

 9   Court may have about this issue.

10       THE COURT:  Well, let me ask you this.  I mean, it seems

11   that we have some evidentiary issues that need to be resolved.

12   Frankly, I was surprised that they weren't included as part of

13   the opposition to your motion for sanctions.  And, you know,

14   there should have been a declaration in there that says here were

15   all the steps that were taken to preserve the information, the

16   supervisory file, the text messages; here were the steps that

17   were taken to search the existing employees' text messages or

18   cell phones or, you know -- I guess they're all existing

19   employees.  I can't recall.  No.  Ms. Roman is not.  In any

20   event, there's, like, no declaration as to here were the steps

21   that we took to preserve evidence so this spoliation motion

22   should be denied.  And so, you know, I'm struggling with do I

23   give Brand another opportunity to come forth with evidence or,

24   you know, something that the Court can use to find that they, you

25   know, met their obligations to preserve evidence, or do I rule on

 1    the record that's before me.  And that's what I'm struggling with

 2    right now.

 3        But, Ms. McFarland, I'm going to give you the last word on

 4    this before I make my decision.  Go ahead.

 5            MS. MCFARLAND:  Thank you, Your Honor.

 6        And I just -- you know, I feel like I didn't really get a

 7    chance to make our argument on this.

 8            THE COURT:  Okay.  Go ahead.

 9            MS. MCFARLAND:  Yeah.  I know that I was answering some

10    questions that were pretty pointed.

11        But I do feel like Karen Riapos did clear -- I mean, I think

12    it's very clear that she says she didn't communicate by text

13    message.  She submitted a declaration that said that.  I think

14    it's notable that Nannette Basa did not have a single text

15    message with Karen Riapos or Michelle Roman or these other people

16    that they're identifying.  If there were text messages, you would

17    think that she would have mentioned that "I know I texted them."

18    She didn't submit a declaration saying there were text messages.

19    So I feel like the record is clear that what we're talking about

20    is Mr. Broschinsky's text messages, and those documents have been

21    produced by plaintiff.

22            THE COURT:  I'm going to stop you there because I think

23    you are missing the point or the evidentiary issues that I'm

24    having, and that's with respect to the preservation.  Not the

25    issue of whether or not they actually have text messages, but

1   what steps were taken by the company to look to see if they have

2   any of these text messages, like, you know, taking their phone

3   and doing the search or something along those lines.

4       So before we get off the topic of text messages, if you could

5   just address that.

6           MS. MCFARLAND:  Sure.  And I apologize if I -- I did

7   want to make that point because I think it's important.

8       With regard to preservation issues, like I said, I think that

9   we had some errors in our -- you know, in the process, and I

10  admit that and we acknowledge that.  But I want to get back to,

11  again, what the rule is, FRCP 37(e), which clearly says that if

12  documents are missing and they cannot be restored or replaced

13  through additional discovery, the Court still needs to find

14  prejudice to the other side from the loss of that information.

15  And the missing documents with regard to Mr. Broschinsky were

16  with a supervisor that supervised her over a year before she was

17  laid off, and he wasn't even involved in the decision to lay her

18  off.  So I do feel -- and I admit that we've made some mistakes,

19  and there's mistakes for sure, and there's nothing I can do about

20  that.  I wish that was not the case.  But I still think that

21  there was no prejudice to Ms. Basa as a result of that because he

22  was not involved in the decision to terminate her.  So even --

23  you know, nor was his, perhaps, a draft of his performance

24  evaluation of her.  That was not a consideration in the factors

25  about why she was selected to be laid off.

1        THE COURT:  Can I ask you a question then?  You know, as

2   I understand it, one of the bases for selecting her for the

3   reduction in force was because she was having performance issues,

4   and if, in 2019, with Mr. Broschinsky, if he has a performance

5   review of her that's glowing, that does seem to be relevant as to

6   whether or not the company's bases for selecting her is

7   pretextual.

8        MS. MCFARLAND:  True.

9        So Ms. Riapos and Ms. Roman testified that the reason she was

10  selected was primarily because we have a layoff.  This is the

11  fourth quarter of 2020.  You know, everything was falling apart,

12  and because of COVID, all of their facilities were shut down.

13  There were serious financial issues.  They made the decision to

14  lay off over 100 people around this same time period because of

15  the reorganization that was necessary as a result of COVID and

16  the downturn in the economy.  So that was the primary reason she

17  was laid off.

18       The secondary reason was that the job that she was working

19  on, which was organizing temporary labor, was no longer going to

20  be necessary.  That's undisputed.  That was her reason.

21       Ms. Karen Riapos testified then also, as another factor --

22  and this was sort of thrown in, but it was true -- she had heard

23  that Ms. Basa was -- you know, there were complaints.  She had

24  received complaints about Ms. Basa's recruiting.  And

25  that's evidenced in documents that we have produced.  She

1    testified about it.  Mr. Higgins is taking the depositions of

2    every single person who was mentioned as having complaints about

3    Ms. Basa and her performance.  Those performance issues were

4    related to her attitude, her lack of responsiveness, you know.

5    And this was in Ms. Riapos's decision-making.  She was not

6    relying upon what Ms. Basa did with Rod Broschinsky over a year

7    before this.  This is her own personal experience and what she

8    had received as commentary from people about Ms. Basa's

9    performance.

10        So it's not overall general performance.  Her performance

11    evaluations are not bad.  I mean, there's nothing in them that

12    says she was underperforming or that that was the reason she was

13    laid off.  It was one of the things that Karen mentioned as

14    another factor in why she thought it was a good decision to

15    select Ms. Basa for this layoff.

16        So I do, again, think that Mr. Broschinsky's file, while,

17    admittedly, should have been preserved and we should have it,

18    it's still not prejudicial to plaintiff as far as any of the

19    issues in this case.

20            THE COURT:  All right.  I didn't want to -- were you

21    done with your presentation?

22            MS. MCFARLAND:  Yes, Your Honor.  I mean, I think

23    that's it.  I mean, Ms. Basa, even in her motion, in the moving

24    papers, on page 8, she says she doesn't have prejudice.  She

25    said, "Because the electronic communications sought here no

1  longer exist, the extent of prejudice to plaintiff is difficult

2  to know." So she's assuming that there might be some documents

3  in the text messages or in the file that would be helpful to her,

4  and she's assuming there's prejudice, but she doesn't have any

5  prejudice because he really wasn't related -- you know, he wasn't

6  involved in this decision.

7          THE COURT:  Okay.

8          MS. MCFARLAND:  It would be another matter altogether if

9  he had said -- you know, if he had weighed in on this decision,

10  if Mr. Broschinsky said, "I think that Nannette Basa should be

11  terminated or laid off because of her performance issues for me."

12  You know, that's a whole different kettle of fish.  That's, you

13  know, very clearly relevant, his opinion of her and his notes,

14  his contemporaneous notes that he might have taken about his

15  evaluation of her.  But a year before she's selected, you know,

16  by people who are not him, it's a different -- you know, it's not

17  really relevant.  And so I'd submit that while it's regrettable,

18  it would not -- it's not relevant and it's not prejudicial to

19  plaintiff.

20          THE COURT:  Would it -- I mean, Mr. Broschinsky's files,

21  I think that's a done deal, unless somebody finds the file in

22  Georgia, but it sounds like the text messages are not going to be

23  found.

24      With respect to the Teams messages and the text messages,

25  would it be too difficult to have somebody submit a declaration

1    that says when and how they conducted the search for the text

2    messages on cell phones?

3             MS. MCFARLAND:  I don't think so.  We could do a

4    declaration.

5             THE COURT:  Mr. Higgins, I mean, Ms. McFarland does

6    raise a good point about prejudice and, you know, how do I find

7    prejudice.  I really don't have anything in the record other

8    than, you know, there might be something there.

9             MR. HIGGINS:  Well, you have Mr. Broschinsky's own

10   testimony that the performance evaluation was good and now we

11   don't have it.  So we don't know how good it was.  I can't quote

12   from it.  I can't enlarge it and show it to the jury and say,

13   "How can this person who was doing this now be this?"  I also

14   can't argue that these performance issues, like the one that

15   supposedly was raised by Rod Broschinsky to Karen Riapos about

16   strained communications with plaintiff, I can't now prove that

17   they were insignificant because they didn't even take notes and

18   put them in the file.  Because he says, "Oh, I may have taken

19   notes.  I'm a pretty good note-taker."  But they don't have the

20   file.  So now the jury goes "Okay."  Now I can't show he didn't

21   take notes.

22        The same with all the text messages and the Teams messages

23   that may be similar to the e-mails that I have that are helpful

24   to the case.  The e-mails that I have that are similar are the

25   conversations where Karen Riapos talks about the future plans for

1   Nannette Basa, that she wasn't really a bad employee, she didn't

2   have all these performance issues, that she was planning to do

3   this with her or that with her.  Just the kind of normal

4   communications about plaintiff that probably existed.  I think

5   it's easy to find, based on the review of the e-mails, that

6   similar Teams messages/text messages probably existed.

7        So it doesn't, of course -- and that's the quote from the

8   brief, is that the "extent of the prejudice" cannot be known.  I

9   said that.  I stand by that.  That doesn't mean that there is no

10  prejudice.  That just means it's hard to quantify.

11       And so, you know, the remedy is typically to say to the jury:

12  You may find that the information would have been helpful to the

13  plaintiff.  You don't have to.  It's not a mandatory.  And they

14  can argue, no, there's nothing in there that would have been

15  helpful.  And it doesn't seem to me to be an onerous instruction

16  such as a mandatory "You must find" that it would have been

17  helpful to the plaintiff, or, even worse, striking defenses, like

18  you can't argue performance issues because you haven't given all

19  the information that might be -- that might undermine the

20  performance concerns.

21            THE COURT:  When we're talking about those sanctions,

22  don't I have to find that there was culpability, like there was

23  an intent on the part of Brand?

24            MR. HIGGINS:  Well, I have two answers to that.  One is,

25  not according to Judges Coughenour, Robart, and Lasnik, all of

1   whom have written opinions after the adoption of 37(e), and they

2   don't say anything about that.

3        Judge Coughenour, in *Musse*, in 2021, says, "A litigant has a

4   culpable state of mind for spoliation purposes if the evidence

5   was destroyed knowingly, even without intent to breach a duty to

6   preserve it, or negligently."  I mean, it's stated about as

7   squarely as you can.

8        The second answer to that is, I found this morning -- I was

9   thinking about that question and sort of anticipating it, and so

10  I did some research this morning and found that there are lots of

11  good cases that say that you can find intent from circumstantial

12  evidence.  You don't have to, you know, show some sort of:  We

13  wanted to get rid of these documents because they knew they were

14  helpful to the plaintiff.  And, you know, if the Court wants to

15  get into that, I would suggest looking at a recent case from the

16  District of Arizona called *Fast v. GoDaddy*, and it's 340 F.R.D.

17  326.  At page 339, there's a collection of cases.

18       Did I go too fast?

19            THE COURT:  No.  I got it.

20            MR. HIGGINS:  Okay.

21       There's a collection of cases there about how circumstantial

22  evidence may be accorded equal weight with direct evidence, and

23  if you put enough together -- I mean, basically, what I don't

24  understand is if a litigant decides I'm not going to really do

25  anything to preserve evidence, isn't that intentional?  Isn't

 1    that --

 2              THE COURT:  Yeah.  You know, I was just -- you know,

 3    *Apple v. Samsung*, I know it's not out of this jurisdiction, but I

 4    thought the Court there had a good way of looking at it and

 5    referring to it as "conscious disregard."  So conscious disregard

 6    of your discovery obligations or preservation obligations could

 7    be found by failing to do as little as issue a litigation hold

 8    notice to any employees -- in that case, it was for eight months

 9    after its preservation duty arose -- and further delaying

10    issuance of a litigation hold notice to several key custodians.

11    And that act justified, although negligent, but was in conscious

12    disregard to the duty to preserve.

13         It's sort of the situation that we have here.  But I don't

14    want to make that finding based on the record that I have before

15    me.  And one question, Mr. Higgins.  You said that you have a

16    deposition coming up.  Is it a 30(b)(6) deposition on this issue?

17              MR. HIGGINS:  Yes, Your Honor.

18              THE COURT:  Okay.

19         And Ms. McFarland has already indicated that she can get

20    declarations from declarants stating when the cell phones were

21    searched for text messages, how they were searched, when the

22    Microsoft Teams -- I don't know if it's an account, that you

23    search by account or across the entire company -- but when they

24    were searched, how they were searched.

25         So how much time, Ms. McFarland, do you need to submit those

```
1    declarations?
2              MS. MCFARLAND:  Can I get two weeks?
3              THE COURT:  I think that's fine.
4         And then, Mr. Higgins, when is your 30(b)(6) deposition on
5    this topic?
6              MR. HIGGINS:  It's split up over a couple of days.  So I
7    don't remember.  It's either the 26 or the 27th.
8              THE COURT:  Okay.  So well within the two-week period?
9              MR. HIGGINS:  Right.
10             THE COURT:  I --
11             MR. HIGGINS:  Go ahead.
12             THE COURT:  Let me try what I'm going to order and then,
13   Mr. Higgins, I will give you an opportunity to respond as well as
14   Ms. McFarland.
15        Two weeks from today, which would be -- I'll get the calendar
16   out -- is that the 1st?  By November 1st, I would like each side
17   to submit a supplemental brief attaching any declarations or
18   evidence/transcripts in response to the motion for sanctions for
19   spoliation.  And that the briefs should be no more than seven
20   pages each.  And then after submitting the supplemental
21   information, I will rule on the underlying motion for sanctions
22   for spoliation.
23             MR. HIGGINS:  Your Honor, the only -- I want to make two
24   points.  One is that this has been exceedingly frustrating and
25   time consuming for a couple of solo practitioners who have been
```

 1   trying to get text messages and explanations, basic explanations,

 2   like the ones you are ordering now, about where are the text

 3   messages, where is the information we expected to find that we're

 4   not finding, and to be told at the eleventh hour that Karen

 5   Riapos suddenly remembers that she searched her phone and things

 6   like this.  It's just -- you know, it's incredibly frustrating,

 7   and that's really not a legal argument.

 8       And then, secondly, I would say I don't know how quickly

 9   court reporters can get transcripts turned around, but would you

10   be all right with giving us until the end of the day,

11   November 2nd, to get -- just an extra day might help with getting

12   transcripts from the court reporters.

13           THE COURT:  Yes, I am comfortable giving you until the

14   end of the day.  Or just file it by November 2nd, which gives

15   you, I think, until 11:59 p.m.

16           MR. HIGGINS:  Right.

17           THE COURT:  Okay.  I understand your frustration,

18   Mr. Higgins, and I do believe part of your motion for sanctions

19   was for attorney's fees as well; is that right?

20           MR. HIGGINS:  Yes.

21           THE COURT:  Okay.  That's something that the Court will

22   address once I receive the supplemental briefs from both parties.

23       All right.  Is there anything -- so I'm going to defer ruling

24   on Docket No. 30.

25       Is there anything else, Ms. McFarland?

1        MS. MCFARLAND:  No.

2        THE COURT:  Anything else, Mr. Higgins?

3        MR. HIGGINS:  No.  Thank you, Your Honor.

4        THE COURT:  Okay.  We will be in recess.

5        MS. MCFARLAND:  Thank you.

6        THE CLERK:  Court is in recess.  Thank you, everyone.

7                    (Adjourned.)

8

9

10              C E R T I F I C A T E

11

12      I, Nickoline M. Drury, RMR, CRR, Court Reporter for the

13  United States District Court in the Western District of

14  Washington at Seattle, do certify that the foregoing is a correct

15  transcript, to the best of my ability, from the record of

16  proceedings in the above-entitled matter.

17

18

19                    /s/ Nickoline Drury

20                    Nickoline Drury

21

22

23

24

25